Argued 10 October, decided 23 October, 1905; rehearing denied 9 January, 1906.

## STATE *v.* RYAN.

82 Pac. 703 ; 1 L. R. A. (N. S.) 862.

CONSPIRACY — EVIDENCE OF ACTS AND WORDS OF CONSPIRATORS.

1. Declarations and acts of every member of a conspiracy, said and done during the existence of such conspiracy, and in furtherance of its purposes, are competent evidence against all the conspirators.

ORDER OF PROOF — CONNECTING EVIDENCE.

2. It is discretionary with the trial court to admit evidence of acts or declarations of alleged conspirators before sufficient evidence is given of the conspiracy; but the conspiracy must be shown to have existed and the defendant must be connected with it by subsequent evidence, or such evidence should be withdrawn from the jury.

NATURE OF EVIDENCE OF CONSPIRACY.

3. Conspiracies are usually established by circumstantial evidence, as of the acts and statements of persons involved, and direct testimony is not necessary.

IDEM.

4. Evidence of the conduct of several alleged conspirators at different times and places not in the presence of each other, is competent on the question of conspiracy, if the acts shown reasonably seem to tend to the accomplishment of a common purpose.

This case illustrates this rule of evidence: It appearing that defendant obtained possession of prosecutor's money by acting as stakeholder for a pretended race that was not run, that one of the parties involved met prosecutor some days before in another city where he explained the plan of the proposed race and afterward introduced the prosecutor to defendant, and that subsequently the stake was forfeited through the absence of the runner on whom prosecutor had been induced to bet, evidence of the acts and declarations of the party who first brought the scheme to the attention of the prosecutor are competent both to show that there was a conspiracy and to indicate its course and extent.

LARCENY — EMBEZZLEMENT — OBTAINING POSSESSION BY FRAUD.*

5. Where a person is induced by some deception to part with the possession of money or property to one who intended to appropriate it, and does so, the taking constitutes larceny, whatever may be said where the owner intends to part with not only the possession but the title as well.

---

*NOTE.— See note to this case, collecting several authorities, 1 L. R. A. (N. S.) 862, and notes in 87 Am. St. Rep. 786 and 88 Am. St. Rep. 600.— REPORTER.

EVIDENCE OF ESCAPE.

6. It is always competent to show that a defendant fled before arrest, but the purpose of the flight is to be determined by the jury.

From Marion: GEORGE H. BURNETT, Judge.

J. C. Ryan, not being entirely contented with a sentence of three years in the penitentiary for participating in a robbery perpetrated by means of a fake foot race, appeals, insisting that his offense, if any, is obtaining money by false pretenses, or a gross cheat at common law.

AFFIRMED.

For appellant there was a brief over the names of *James McCain*, *W. H. Holmes* and *Webster Holmes*, with an oral argument by *Mr. McCain* and *Mr. William Henry Holmes*.

For the State there was a brief over the names of *A. M. Crawford*, Attorney General, *John H. McNary*, District Attorney, and *Peter Henry D'Arcy*, with an oral argument by *Mr. D'Arcy* and *Mr. Isaac Homer Van Winkle*.

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

The defendant was convicted of the crime of larceny, and appeals from the judgment rendered in pursuance thereof.

The subject of the larceny was $2,000, consisting of 100 gold $20 pieces, current money of the United States, alleged to have been the property of one John F. Roth, the prosecuting witness. Roth testified in substance that he was acquainted with the defendant; that he met him in Salem, Oregon, at the Willamette Hotel on the 23d day of September, 1904; that defendant came to a room in the hotel occupied by witness and a party by the name of Huston, and was introduced to him by Huston; that witness met Huston in Portland, about two days prior to this date, in Doctor Pohl's office, and had a conversation with him therein; and that he explained what he was up for. Witness continues (quoting from the bill of exceptions):

"Huston told me that two men here at Salem were trying to get up a foot race, and he said that they wanted some bona fide business man to come up here and hold the money for them; and he says, if he could get me to come up here, he would assure me that he would pay me well for my trouble. He said I did not need to bet anything. He said them two fellows had lots of money. All they wanted was for me to come up here and hold the money, and divide it fairly after the race was over, and I agreed to come up on those conditions; and I came up here, and on Friday evening we went to the hotel, and Ryan came up to our room, and Huston introduced me to him, and he [Ryan] explained the thing differently. He said he wanted to bet some money on a foot race against Raymond. He said Raymond was a friend of his, and he wanted me to bet against Raymond for him, and he said he would pay me for my trouble. Next day he met us again and wanted to know if I had any money in the bank to show I was a business man in Portland. The next day Ryan came to the hotel again, and wanted to know if I had any money to show, in case of an argument, that everything was all right, that I was responsible, and I told him that I had a bankbook, the money that was put in the bank from our business, and a small check, and he said in case of an argument he wanted to show about $2,000 in the bank; that that would be enough to satisfy Raymond probably, if he lost that much money and wanted to protest the race. He wanted me to go back and make arrangements so I could get $2,000, and I went back and explained the case to my brother-in-law, and he let me have that amount of money. Ryan said we might not have to draw it and I agreed to it, and we came back here Tuesday, Huston and I, and Ryan met us and went to the hotel with us, and we had dinner, and after dinner he [Ryan] went out. About 1 o'clock Ryan met us again, and he took us down to his room — it was over a saloon on the corner — and he introduced me to this man Raymond, and Raymond said that he wanted to bet some money on a foot race. Ryan gave me a bunch of greenbacks marked $2,500, and he said, when Raymond came, 'You bet this money with him,' so Raymond said he wanted to bet, and he put down $2,500

in greenbacks. Raymond said he would go back to the bank, and Ryan gave me a bunch, $3,000, all in greenbacks, and I bet Raymond all this other bunch. It was put in a little grip, and Raymond went downstairs with this man, Morris. While he was down there, Ryan gave me another bunch of $5,000 in greenbacks, but he says, 'Go down and draw your money,' and he said, 'I want the money.' I did not think anything about it being a scheme, and I went down to draw my money. It was $2,000. I got it all in 20-dollar gold pieces. When I got back, Raymond says, 'I have got $5,000 more,' and I bet him the $5,000 which Ryan gave me. Ryan says, 'Did you draw your money from the bank?'—and I had it in a little bag, and Ryan took it and he put it in a grip and he says, 'We will run the race,' and he says, 'Leave the money in the bank,' and he stepped out about five or ten minutes and came back and showed me a little receipt, which read: 'One grip and contents deposited here.' He folded it up and put it in his pocket, and said, 'After the foot race we will get it,' and we went out to the ball ground, and, when we got there, there were a few boys in there, about 16 or 18 years old, playing ball. Then it was decided to go back of the ball ground, and they went back there, and Ryan stepped off 60 feet and told me to go to one end while he measured off 60 feet, and I stayed up there, and the men started to run and one fell down, and Ryan said to Raymond: 'We will run this thing over inside of 10 days,' and he said: 'All right. We will go to the race track or some other place,' and we agreed all around that we would run it off in 10 days, and Ryan said: 'We will leave the money in the bank until after the race comes off,' and I went back to Portland that same night, and Huston went along."

The witness further testified in substance that he came to Salem on the 23d of September in company with Huston; that Ryan, Raymond, Morris, Huston, and another man accompanied him to the race; that Morris was one of the runners and Huston the other; that Ryan was supposed to be betting on Huston and Raymond on Morris.

The defendant offered evidence tending to show that he

met Roth, the prosecuting witness, for the first time on the 23d of September, 1904; that he was not introduced to him, but that Roth came to him on the street and said to him, in substance : "We understand that you know something about athletics, and [referring to the foot race in question] we would like for you to be stakeholder," which the defendant consented to do. He said, amongst other things, to the defendant, that he wanted it understood that this race was to be run as private as possible, and, as his partner was interested with him, he did not want him to know this race was coming off ; and, further, the defendant testified and offered evidence tending to show that, after the race was run and was unsatisfactory to Roth, it was agreed between Roth and Raymond, who was backing the other runner, Morris, that the race should be again run on the following Saturday; that the defendant retained the money until late in the evening Saturday, and after the time had expired within which the race was to be rerun. Raymond and Morris, his runner, were present, ready to rerun the race, but that Roth did not come with his runner to contest ; that after his time had expired [the defendant] as stakeholder turned the money in his hands over to Raymond.

The foregoing testimony illustrates fairly the respective positions of the parties litigant. There was an objection interposed to the prosecuting witness detailing what was said and done by Huston in Portland, that being two days prior to the time they met the defendant in Salem, on the ground that such evidence was incompetent by which to establish the defendant's guilt. The court, however, permitted it to go to the jury upon the assurance on the part of the State's attorney that he would connect up Huston with the defendant in the transaction later on in the trial. Error is now predicated upon the admission of such testi-

mony, not because of the order in which it was allowed to go to the jury, but solely upon its incompetency.

1. The theory of the State is that both Huston and the defendant were, with others, engaged in a conspiracy to wrongfully obtain the money in question from Roth, and that what was said and done by Huston in Portland was in furtherance of such conspiracy, and therefore tantamount to the utterances and acts of the defendant himself. It is a matter, perhaps, of substantive law, rather than a rule of evidence, that what one conspirator says and does during the existence and in furtherance of the conspiracy are the utterances and doings of all, on like principle that the acts of an agent within the legitimate scope of his employment bind his principal as if done by the latter. The conspirators are all principals, and the acts of each are the acts of his fellow-conspirators, and are binding upon that basis. Unless, therefore, the relationship is such as to make them all principals, none are affected, except the party whose acts or admissions are in question. When the appropriate relationship is shown, then may the acts and utterances of each be shown as the acts and utterances of all: 3 Wigmore, Evidence, § 1797 ; 15 Am. Law Rev. 80. The common expression of the books seems to be that "those declarations only are admissible which are made by a conspirator during the existence of the conspiracy, and in furtherance of it": Underhill, Crim. Ev. § 493. Greenleaf says that the acts and declarations must "be those only which were made and done during the pendency of the criminal enterprise, and in furtherance of its objects": 1 Greenleaf, Evidence (16 ed.), § 184*a*.

2. Now, it is argued that what Huston said and did in Portland was prior to the formation of any conspiracy between the parties concerned in the theft. But is the premise well founded? It is not material at what particu-

lar time any one entered into the conspiracy. It is enough to know that he was a common conspirator. The acts or declarations of one or more of the conspirators are sometimes admitted before sufficient proof is given of the conspiracy. This rests, however, largely within the discretion of the trial court, but the proper connection must be subsequently made, so as to show prima facie a conspiracy between all, before such acts or declarations will ultimately be permitted to go to the jury. Such is the course pursued in the present case.

3. A conspiracy may be proven by showing the declarations, acts and conduct of the conspirators. It is seldom possible to establish a specific understanding by direct agreement between the parties to effect or accomplish an unlawful purpose. Usually, therefore, the evidence must be necessarily circumstantial in character, and will be sufficient, if it leads to the conviction that such a combination in fact existed. Thus, if it be shown that the conspirators were apparently working to the same purpose, — that is, one performing one part and another another,— each tending to the attainment of the same object, so that in the end there was apparent concert of action, whether they were acting in the immediate presence of each other or not, it would afford proof of a conspiracy to effectuate that object: *Mussel Slough Case* (C. C.) 5 Fed. 680 ; *United States* v. *Sacia* (D. C.) 2 Fed. 754. Such proofs would evidence prima facie a conspiracy. So it is, as was pertinently said by PENNEFATHER, C. J., in *R.* v. *O'Connell*, cited and quoted in 2 Wigmore on Evidence, § 1079: "If the conspiracy be proved to have existed, or, rather, if evidence be given to the jury of its existence, the acts of one in furtherance of the common design are the acts of all; and, whatever one does in furtherance of the common design, he does as the agent of the co-conspirators."

4. Now, a conspiracy between Huston and the defendant was not shown prima facie sufficient to carry the case to the jury, until their acts and conduct two days later in Salem were detailed by the witness. But Huston's declarations and representations to Roth in Portland, and the fact that the former accompanied the latter to Salem, leading to a meeting with the defendant and the other parties concerned in the scheme, coupled with the further fact that the scheme was then carried to a successful issue, all participating, show a common design of all. That design could not have been successful without Roth's presence in Salem, and Huston played the part of bringing him here. This affords evidence in itself of a conspiracy existing prior to the time that Huston talked with Roth in Portland, and, further, that the acts and declarations of Huston in the presence of Roth were but a part of the common design to effectuate the purpose of the conspiracy. What Huston did, therefore, in Portland was in furtherance of the common design and prima facie, at least, during the existence of the conspiracy. The scheme included a foot race and a betting thereon, or a simulation to that effect. Huston talked about such a scheme in Portland, and, when he induced Roth to come to Salem, the defendant took the matter up where Huston had left it, and Huston subsequently participated in the race. Could there be any more pertinent evidence of a conspiracy between Huston and the defendant to accomplish an unlawful purpose, and that it had its origin prior to Huston's meeting Roth in Portland? Clearly not. The ruling of the trial court in admitting the evidence was therefore unexceptionable : *State v. Moore*, 32 Or. 65 (48 Pac. 468), is by analogy authority for this view, and *State* v. *McGee*, 81 Iowa, 17 (46 N. W. 764), so much relied on by appellant, is not adverse.

5. The next assignment of error relates to the following instructions of the court, to wit :

"If, however, the property was received or taken by the defendant with a felonious intent at the time, he is guilty of larceny, even though it were by the owner's consent. Any preconcerted plan to obtain money, and an intent to steal coupled with that plan, is felonious. If money is obtained by trick, artifice, or device, as fraudulently obtaining it under color of a bet, inducing a person to bet merely for the purpose of getting possession of the stakes deposited, and with the intent to appropriate them, regardless of the event on which the bet was made, is larceny. So you are to consider whether or not this whole transaction was a mere scheme or device to steal Roth's money. If it appears to you beyond a reasonable doubt that the defendant entered into such scheme, either by himself or with others, intending all the time to steal this money from Roth, and you should believe that beyond a reasonable doubt, and further find that he did get the money by such scheme, you should find him guilty as charged in the indictment."

The meaning intended to be conveyed by the language quoted is elucidated by a preceding clause and others that followed, whereby it was explained that, if the property was received in good faith, a subsequent wrongful conversion would not support an allegation of larceny in the original taking, and, further, that if the bet was made, and Ryan was a stakeholder in good faith, he could pay the money over to the winner at any time after the race, and before a return was demanded by Roth, and the transaction would not constitute larceny. The legal significance of the term "bet" or "wager" is well understood. The contention of appellant is that, if Roth bet his money on the foot race in question, it is not of the slightest legal consequence how he came to do so, whether he was so induced by fraud or not, or whether the foot race was fair or not; that in either or any event he parted with his money voluntarily, and, there not being present the element of trespass, there could be no larceny.

The proposition goes beyond the authorities. It is not larceny, say the learned authors of the American and English Encyclopædia of Law (volume 18, 2 ed., 482), to obtain money "by inducing a person to bet on some game or trick, and then, by fraudulently making it appear that the party betting has lost, taking the stakes deposited by him." The text seems to be based upon an old English case, where the party parted with his property on a wagering trick, supposing that he had lost fairly: *King* v. *Nicholson*, 2 Leach, C. C. 610. By a footnote the authors further say: "A distinction is to be noted between apparently winning a bet by fraudulent means and by inducing a party to deposit money or goods on a bet merely as a means of getting possession of them." The principle applicable for determining whether money obtained fraudulently amounts to larceny or not is well illustrated in *People* v. *Tomlinson*, 102 Cal. 19, 23 (36 Pac. 506, 507). The court say: "Where one honestly receives the possession of goods upon trust, and after receiving them fraudulently converts them to his own use, it is a case of embezzlement. If the possession has been obtained by fraud, trick, or device, and the owner of it intends to part with his title when he gives up possession, the offense, if any, is obtaining money by false pretenses. But where the possession has been obtained through a trick or device, with the intent, at the time the party receives it, to convert the same to his own use, and the owner of the property parts with the possession and not with the title, the offense is larceny." The distinction was applied in a later case: *People* v. *Shaughnessy*, 110 Cal. 598 (43 Pac. 2). Mr. Justice Caton states the principle a little more comprehensively in *Welsh* v. *People*, 17 Ill. 339. He says: "The rule is plainly this: If the owner of goods alleged to have been stolen parts with both the possession and the title to the goods to the alleged thief, then neither the taking or

the conversion is felonious. It can but amount to fraud. It is obtaining money under false pretenses. If, however, the owner parts with the possession voluntarily, but does not part with the title, expecting and intending that the same thing shall be returned to him, or that it shall be disposed of on his account, or in a particular way, as directed or agreed upon, for his benefit, then the goods may be feloniously converted by the bailee, so as to relate back and make the taking and conversion larceny." This doctrine is expressly reaffirmed by two later cases from the same State: *Stinson* v. *People*, 43 Ill. 397; *Doss* v. *People*, 158 Ill. 660 (41 N. E. 1093, 49 Am. St. Rep. 180). The latter comes very near on the facts to the case at bar.

Now, if the defendant and his co-conspirators made use of the bet as a scheme or device to secure possession of Roth's money, and at the same time the bet was merely simulated, it not being intended that there should be a bona fide foot race between the supposed contestants, and the money was received to be disposed of on the result of such race, and the race was not run bona fide, and was not so intended from the beginning, then it was larceny in the defendant to appropriate it. The money was received by the defendant to be disposed of in a particular way; that is, to be held as stakes to abide the event of a bona fide foot race. If Roth won, the money was to be returned to him with his winning, but, if he lost, then to be turned over to Raymond. Such was the effect of the wager, if real. If, however, there was not to be a bona fide race, and the defendant intended to retain the money to his own use, and not to dispose of it on account of Roth, or in a particular way to which Roth had assented, then there was a larcenous taking, for Roth would never have assented to staking his money if he had known that it was to be retained in any event. Though he may have voluntarily given the money into the hands of the defend-

ant, he did not part with the title, because he was tricked to believe there was to be a fair and bona fide foot race; and, while he might have intended to bet, the defendant did not intend that he should have any chance of winning, and therefore did not intend to account for the money or dispose of it in the particular way agreed upon. Thus he obtained Roth's money feloniously, and was guilty of larceny from the inception. If this is not larceny, then the distinction is too refined for practical and safe application. As was said by Mr. Justice CAMPBELL, in *People* v. *Shaw*, 57 Mich. 403, 406 (24 N. W. 121, 122, 58 Am. Rep. 372), whose language is peculiarly apt in the present exigency: "We do not think it profitable to draw overnice metaphysical distinctions to save thieves from punishment. If rogues conspire to get away with a man's money by such tricks as those which were employed here, it is not going beyond the settled rules of law to hold that the fraud will supply the place of trespass in the taking, and so make the conversion felonious."

The circuit court properly distinguished between a real bet and one that was merely colorable or simulated for the purpose of getting wrongful possession of Roth's money, and the instructions are not vulnerable to the objections interposed.

6. The court further instructed that evidence of an escape is always admissible as against the defendant, but at the same time left it to the judgment of the jury whether or not the real purpose of the defendant was to escape justice or to go about his affairs innocently. This is assigned as error. The matter is disposed of, however, favorable to the instructions in *State* v. *Lee*, 17 Or. 488 (21 Pac. 455). No further comment is necessary.

The judgment of the circuit court will be affirmed, and it is so ordered.                                    AFFIRMED.