Decided 28 January, 1908.

## BECKWITH *v.* GALICE MINES CO.

93 Pac. 453.

LARCENY—FALSE PRETENSES—DISTINCTION.

1. Where possession of personal property is obtained from the owner by fraud, trick, or device, and the owner intends to part with both possession and the title when he surrenders control of the property, the offense is obtaining property by false pretenses; but if the possession is fraudulently secured, and the owner does not intend to part with the title, the offense is larceny.

CORPORATIONS—STOCK—"CERTIFICATE OF STOCK."

2. A certificate of stock is the written evidence of the right of a party to a *pro rata* share of the net profits of a corporation when declared, or to a like share of the assets after payment of its debts in case of dissolution of the corporation. Such certificates are not negotiable, but the owners may be estopped to assert title as against *bona fide* purchasers for value without notice.

SAME—TITLE—BONA FIDE PURCHASER—ESTOPPEL.

3. Plaintiff, pursuant to a contract for the sale of certain mining stock, sent the certificates containing a power of transfer, duly signed to a bank designated by the seller, with instructions that it should collect a draft attached for the price, and then deliver the certificates to the buyer. The bank was in fact a mere pretended institution, organized by the buyer to promote his criminal operations in securing possession of unlisted securities without paying therefor. The bank, without authority, delivered the certificates to the buyer, who immediately sold the stock for less than its value, and the stock after several transfers came into hands of defendants, who were *bona fide* purchasers for value. *Held,* that as plaintiff's intention was to transfer the title to the stock, and his voluntary act in delivering the stock to the bank, with the power of attorney executed in blank, thereby permitting the buyer to perpetrate the fraud, plaintiff was estopped to deny defendant's ownership.

From Multnomah: JOHN B. CLELAND, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit to enjoin the transfer on the books of a cor-

poration of certain shares of stock, evidenced by certificates, and to secure a surrender thereof. The complaint sets forth some of the facts hereinafter detailed, and alleges *inter alia* that the plaintiff at all the times stated herein was the owner of the stock mentioned, which was stolen from him and carried away by some person unknown to him, and that he had never received any compensation therefor. The defendant, the Galice Consolidated Mines Co., a corporation, which issued the stock, and the defendants, A. B. Cousin and Milton Weidler, who, at the days specified, were respectively the manager and secretary of the company, having no interest in the result of the suit, did not controvert the facts stated in the plaintiff's primary pleading. J. H. Pickart, H. A. Combs and the Harry S. Lewis & Co., a corporation, by leave of court, were made parties defendant, and jointly answered, denying the material allegations of the complaint, and averring in effect that they were severally the owners of the stock mentioned, which each purchased in good faith for a valuable consideration, and without any notice of the plaintiff's rights to or interest in the property. The reply denied the allegations of new matter in the answer, and the cause coming on for trial, the parties stipulated the facts, in substance, as follows: The plaintiff, J. S. Beckwith, is a broker, doing business at Pendleton, Or., under the firm name of J. S. Beckwith & Co., and dealing in unlisted mining stocks. The defendant mining company prior to October 10, 1905, issued two certificates of its stock to Robert C. Yenney, for 10,000 shares each, and one certificate to E. D. Gaynor, for 5,000 shares, in which vouchers it is stated that they were transferable on the books of the corporation only by the holder thereof in person, or by his attorney, upon a surrender of the certificate, properly indorsed. These certificates were transferred to the plaintiff by the persons to whom they were issued, but as the assignments are identical, except as to the name of the person subscribed thereto, only one indorsement will be given, to wit:

"For value received, ———— hereby assign and transfer unto ———— shares of the capital stock represented by the within certificate, and do hereby irrevocably constitute and appoint

—— to transfer said stock on the books of the within named
corporation, with full power of substitution in the premises.
Dated ——, 190—.

[Signed] Robert C. Yenney.

In presence of
[Signed] L. Y. Keady."

Prior to October 12, 1905, one H. Levy had been dealing
in such stock at Chicago, Ill., and his name then appeared in a
list of persons engaged as brokers in that city, at which time
he notified the plaintiff that his offer to sell 25,000 shares of
the Galice Consolidated Mines Co. at 5¾ cents per share was
accepted, whereupon he directed that the certificates, properly
indorsed, should be sent to the Garfield Bank of Chicago, with
instructions to hold the stock until the money stipulated should
be paid. The plaintiff thereupon, without making any other
indorsements of the certificates, placed them in an envelope, to
which was attached a bill of exchange drawn on Levy, payable
at five days' sight to the order of the First National Bank of
Pendleton, Or., for $1,437.50. The following address: "Mr.
H. Levy, Chicago, Ill., care of Garfield National Bank (exami-
nation permitted)," was written on the envelope, which, with
its contents, was delivered to the Pendleton bank to forward
by mail as indicated. The cashier of the Pendleton bank wrote
to the Garfield National Bank of Chicago as follows: "I in-
close herewith for collection and return our regular No. 38,529.
No protest. H. Levy. $1,437.50"—and placed the letter and
the envelope so delivered in another wrapper, which was ad-
dressed and forwarded by mail to the Garfield National Bank,
Chicago, Ill. Soon thereafter the plaintiff received from Levy
a telegram, which, omitting the immaterial parts, is as follows:

"Stock not at Garfield Bank. If you mailed it to Garfield
National Bank, notify postmaster by mail to deliver it to the
Garfield Bank, 56 Fifth avenue. Postmaster will not recog-
nize instructions by wire. There is no Garfield National Bank.
Wire answer."

Upon the receipt of this message the Pendleton bank, com-
plying with the plaintiff's request, instructed the postmaster at

Chicago to deliver the envelope containing the papers specified, as thus directed by Levy. The Garfield Bank was not organized as a banking corporation, and never did any legitimate banking business; but Levy, or one George R. Neville, had procured its name to be inserted in the Rand-McNally Bankers' Directory, with address as 1028 E. Garfield boulevard, in order to advance their fraudulent schemes. The Garfield Bank is a pretended institution, and as such was conducted by Levy, Neville and others to promote their criminal operations in securing possession of unlisted mining stocks which they disposed of without making any returns in money therefor.. The plaintiff, prior to October 12, 1905, had never done any business with Levy or his associates; nor did he know either of them, or such simulated bank, or their method of doing business. The Garfield Bank, upon the receipt of the envelope mentioned, and without any authority therefor, delivered the certificates to Levy, who sold all the stock in question to brokers at prices not exceeding two cents per share; and neither he, his associates nor the bank ever made any payment therefor, or accounted in any manner for the certificates. The method whereby the plaintiff was deprived of the stock was practiced by Levy and Neville prior thereto in dispossessing many other persons of like property. . Levy, in November, 1905, was arrested and held under an indictment, which charged him with using the United States mails for fraudulent purposes, and Neville, to escape apprehension, left Chicago, and is a fugitive from justice. The stock in question, after several transfers, was purchased by the defendants: J. H. Pickard, 10,000 shares for $325; H. A. Combs, 5,000 shares for $162.50; and the Harry S. Lewis & Co., a corporation, 10,000 shares for $300. Each of the defendants last named was a *bona fide* purchaser of the stock for value, and obtained a certificate therefor, relying upon the authority conferred by the assignment and power of attorney, and each secured such property without notice or knowledge of any claim thereto on the part of the plaintiff. Based on these facts, which in a more extended form the court adopted as its findings, the temporary injunction that had

been issued was dissolved, and the suit dismissed, from which decree the plaintiff appeals.                                    AFFIRMED.

This case was submitted on briefs under the proviso of Rule 16: 50 Or. 580.

For appellant there was a brief over the names of *Mr. James A. Fee, Mr. L. B. Reeder* and *McCourt & Phelps.*

For respondent there was a brief over the name of *Mr. Harry K. Sargent.*

MR. JUSTICE MOORE delivered the opinion of the court.

1. It is contended by plaintiff's counsel that the mode adopted by Levy to secure possession of the stock constitutes larceny whereby no title passed by his delivery of the certificates to the persons from whom the defendants, answering herein, obtained them, and hence an error was committed in dismissing the suit. In support of the doctrine thus maintained two decisions of this court are cited. In *State* v. *Skinner,* 29 Or. 599 (46 Pac. 368), the defendant was indicted for the crime of larceny by bailee. At his trial evidence was introduced tending to show that, as an agent of a building and loan association, the defendant falsely represented to one R. B. Dixon that, in order to secure a loan of money from his principal, the applicant, as a condition and guaranty of good faith, was required to advance 1 per cent of the sum desired, $10 of which was to be paid for procuring and examining an abstract of the title to the farm land offered as security, if the loan was approved, and the remainder to be credited on the note given as evidence of the indebtedness; but if the application for the loan was rejected, the money so paid was to be returned. Dixon thereupon applied for a loan of $10,000, and gave the defendant $100, which the latter converted to his own use. A judgment of conviction having been rendered, the defendant appealed; his counsel maintaining that the evidence was insufficient to establish the existence of any trust relation between the defendant and Dixon, and hence the trial court erred in refusing to direct a verdict of acquittal as requested. In affirming the judgment it was held

that the evidence was sufficient to show that Dixon parted with
the title to the money advanced only in case a loan was made,
and for that reason the testimony was sufficient to warrant a
conviction. In deciding that case an excerpt from the opinion
of Mr. Justice CATON, in *Welsh* v. *People*, 17 Ill. 339, is taken
in distinguishing between simple larceny and larceny by bailee
as follows:

"Where * * the alleged larceny is perpetrated by obtaining
the possession of the goods by the voluntary act of the owner
under the influence of false pretenses and fraud, * * there is
no real difficulty in deducing the correct rule by which to de-
termine whether the act was a larceny and felonious, or a mere
cheat and swindle. The rule is plainly this: If the owner of
the goods alleged to have been stolen parts with both the pos-
session and the title to the goods to the alleged thief, then
neither the taking nor the conversion is felonious. It can but
amount to a fraud. It is obtaining goods under false pretenses.
If, however, the owner parts with the possession voluntarily,
but does not part with the title, expecting and intending that
the same thing shall be returned to him, or that it shall be
disposed of on his account, or in a particular way, as directed
or agreed upon, for his benefit, then the goods may be feloniously
converted by the bailee, so as to relate back and make the tak-
ing and conversion a larceny. The pointed inquiry in such a
case must always arise, did the owner part with the title to
the thing, and was the legal title vested in the prisoner? If
so, he was not guilty of larceny."

The other case is *State* v. *Ryan*, 47 Or. 338 (82 Pac. 703:
1 L. R. A., N. S., 862), in which the defendant was charged
with the crime of larceny. At his trial testimony was intro-
duced tending to show that pursuant to his fraudulent repre-
sentations he induced one John F. Roth to deliver to him $2,000
as evidence of responsibility to hold a sum of money claimed
to have been staked on a trial of human speed, which proved to
be a fake race. The court thereupon charged the jury *inter alia*
as follows:

"So you are to consider whether or not this whole transac-
tion was a mere scheme or device to steal Roth's money."

An exception having been taken to such language, it was contended by defendant's counsel, on an appeal from a judgment of conviction, that an error was thus committed. In affirming the judgment, a part of the opinion of Mr. Justice CATON (*Welsh* v. *People,* 17 Ill. 339), is again quoted, and it was ruled that, if the possession of the money was obtained by fraud, trick or device, and the owner intended to part with the title when he surrendered the control, the offense, if any, was obtaining money under false pretenses, but that, though the possession might have been secured in the manner last indicated, yet, if the owner did not intend to part with the title, the crime was larceny, and hence the instruction was a correct statement of the law applicable to the facts involved.

2. The elementary proposition thus announced is undoubtedly controlling in the case at bar, and the question to be considered is, whether or not the delivery of the certificates to the Garfield Bank of Chicago, manifests an intention on the part of the plaintiff to dispose of the title to the property, or evinces such conduct, on his part, as to estop him, as is alleged in the answer, from asserting any right to the stock as against the parties who purchased it in good faith, for a valuable consideration, and without any notice or knowledge of the means adopted to effectuate the transfer. A certificate of stock is the written evidence of the right of a party to a *pro rata* share of the net profits of a corporation when declared, or to a like share of all its property, after the payment of its debts, in case of a dissolution of the artificial being. Such certificates are not negotiable instruments; but the owners thereof have frequently been held to have been estopped to assert any title thereto as against *bona fide* purchasers thereof for value, without notice of the rights of prior holders. This rule is founded upon the principle that, when the owner of corporate stock voluntarily delivers to another a certificate evidencing a right to participate in the profits or property of a corporation, indorsed in blank, but containing all the indicia of ownership of the property, he is estopped to assert a title thereto as against a person, who in good faith and for value, purchased the certificate from the apparent

owner, relying upon the written assignment. The reason advanced for this rule is thus stated by a text-writer:

"In view of the custom by which certificates indorsed in blank are transferable from hand to hand, like negotiable paper, the owners of such certificates should be required to use the utmost care and diligence in their safe keeping. If a *bona fide* purchaser should be deceived through any negligence or want of diligence in this respect, justice requires that the owner should suffer the loss": Morawetz, Priv. Corp: (2 ed.), .§ 190.

As supporting the text quoted, the case of *Shattuck* v. *American Cement Co.* 205 Pa. St. 197 (54 Atl. 785: 97 Am. St. Rep. 735) affords a good illustration. In that case the plaintiff secured a title to certain certificates of stock, issued by the defendant to another, and delivered to him with an assignment and power of attorney indorsed thereon in blank. Without surrendering the certificates and obtaining others in lieu thereof, or filling the blank spaces in the indorsement, the plaintiff took the certificates to brokers with whom he had been accustomed to deal. The certificates, inclosed in an envelope on which the plaintiff's name was written, were placed in a pocketbook in a safe in which the brokers were in the habit of keeping securities belonging to their customers. One of the brokers, without authority from or knowledge of the plaintiff, took the certificates from the wrapper and pledged them to a bank as collateral security for a *bona fide* loan of money, made to him in the name of his firm, without notice of any interest of the plaintiff therein. Default having been made in the payment of the sum lent, the bank sold the certificates to third parties, whereupon a suit was instituted to enjoin the defendant from transferring on its books such certificates and issuing others in place thereof. The relief sought was granted by the lower court, but on appeal, the decree was reversed, the court holding that the rights of a *bona fide* holder as against the true owner of the stock to whom the apparent owner had sold or pledged it, do not depend on a negotiable character of the certificates, but rest on the principle that, where one has conferred upon another by a written transfer all the indicia of ownership of property, he is

estopped to assert title to it as against a third person, who has in good faith purchased it for value from the apparent owner. So, too, in *McNeil v. Tenth National Bank*, 46 N. Y. 325 (7 Am. Rep. 341), it was held that, where the owner of bank stock delivers to his brokers, to secure a balance of account, certificate of shares, indorsed with blank assignment, and irrevocable power of transfer, and the brokers without his knowledge pledge the shares with other securities for advances, one who pays the advances at the brokers' request, and in good faith receives from them the certificates and other securities, is entitled to hold the shares as against the owner for the full amount of the advances remaining unpaid, after the other securities are exhausted. In deciding that case Mr. Justice RAPALLO, speaking for the court, says:

"It must be conceded that, as a general rule, applicable to property other than negotiable securities, the vendor or pledgor can convey no greater right or title than he has. But this is a truism, predicable of a simple transfer from one party to another where no other element intervenes. It does not interfere with the well-established principle that, where the true owner holds out another, or allows him to appear, as the owner of or as having full power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing as against them the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance."

To the same effect see, also, 26 Am. & Eng. Enc. Law (2 ed.), 879; 10 Cyc. 631; *Brittan v. Oakland Bank*, 124 Cal. 282 (57 Pac. 84: 71 Am. St. Rep. 58); *Walker v. Detroit Transit Ry. Co.* 47 Mich. 338 (11 N. W. 187); *Mount Holly, etc., Co. v. Ferree*, 17 N. J. Eq. 117; *Pennsylvania R. Co.'s Appeal*, 86 Pa. St. 80; *Wood's Appeal*, 92 Pa. St. 379 (37 Am. Rep. 694); *Burton's Appeal*, 93 Pa. St. 214.

3. In the case at bar the Garfield Bank of Chicago was evidently organized to promote the fraudulent practices of Levy

and his associates, who knew that certificates of stock, assigned in blank, would not in all probability be sent to strangers as intending purchasers. The insertion in a bankers' directory of such pretended institution would allay suspicion, and give color to Levy's apparent honesty, when he requested the plaintiff to send the certificates to that bank, properly indorsed, to be held until the consideration agreed upon had been paid. The First National Bank of Pendleton, instead of mailing the certificates to its regular correspondent in Chicago, which would undoubtedly have been done except for the plaintiff's request, obeyed his direction, and sent the papers, and ultimately caused the postmaster of that city to deliver them to the simulated bank. That the scheme throughout was the rankest kind of fraud will be admitted. The plaintiff, however, voluntarily made such bank his agent, clothed with apparent authority, and surrendered possession of the certificates with the intent that the title to the stock should be transferred to Levy, and the only breach of the agreement consists in his failure to pay the consideration which he had promised for the stock. The facts herein are not the same as in *State* v. *Skinner*, 29 Or. 599 (46 Pac. 368), or in *State* v. *Ryan,* 47 Or. 338 (82 Pac. 703: 1 L. R. A., N. S., 862), for in such cases the title to the money, the possession of which was delivered to the respective defendants, was never expected to pass to them.

It was the plaintiff's voluntary act that made it possible for the defendants, answering herein, to rely upon the apparent ownership of the stock, evidenced by the assignment and irrevocable power of attorney executed in blank, and as a consequence of such belief, to expend their money without notice of any adverse right in or title to the stock. The plaintiff's intention to transfer the title to the stock, and his conduct in relation thereto, estop him, and bring the case within the rule that, when one of two innocent persons must necessarily sustain injury by the fraudulent act of a third party, he who first trusted such party, and placed in his hands the means of committing the wrong, must bear the loss.

The decree is therefore affirmed.              AFFIRMED.