## CAPITOL HILL UNDERTAKING CO. v. RENDER.

No. 19828. Opinion Filed March 10, 1931.

Withdrawn, Corrected, and Refiled, and Rehearing Denied May 5, 1931.

Second Petition for Rehearing Denied June 9, 1931.

Billups & Billups, for plaintiff in error.

John R. Guyer and Ledbetter, Stuart, Bell & Ledbetter, for defendant in error.

ANDREWS, J. The defendant in error, hereinafter referred to as plaintiff, recovered a judgment in the district court of Oklahoma county against the plaintiff in error, hereinafter referred to as defendant, to the effect that the defendant, within ten days from the date of the judgment, "* * * issue and deliver to the plaintiff a certificate for 23 shares of its capital stock out of the unissued portion of such capital stock and deliver the same to plaintiff, and in the event that defendant fails, refuses or neglects to issue said certificate for 23 shares of capital stock and deliver same to plaintiff within ten days from March 20, 1928, then it is further ordered, adjudged, and decreed that plaintiff do have and recover of defendant the sum of $2,300 with interest thereon from the 11th day of April, 1927, at 6 per cent. per annum, for which let execution issue." By permission of the court in the order overruling defendant's motion for new trial the defendant was permitted to deposit with the court clerk a certificate for 23 shares of its capital stock, the same to abide the result of the appeal of the defendant from the judgment.

The plaintiff was the wife of S. P. Render, who, it is admitted, was her agent. She was the owner of 23 shares of the capital stock of the defendant corporation which was represented by stock certificates held by her. Printed on the backs of those certificates were forms of assignment and power of attorney similar to those commonly used for the transfer of shares of stock.

S. P. Render signed those blanks "S. P. Render" for his wife, the plaintiff, and delivered the certificates of shares with the blanks thereon so signed, together with certain certificates of shares of his own, to C. P. Beauchamp. C. P. Beauchamp completed the assignments and powers of attorney by filling them out in his own name. He then caused the certificates of shares to be canceled by the corporation and new certificates to be issued to him in his own name.

Thereafter the plaintiff demanded of the defendant that the certificates delivered by S. P. Render be canceled and that new certificates be executed and delivered to her. The corporation refused to comply with that demand and thereupon the plaintiff instituted this suit.

The defendant was compelled to rely largely upon books and records of the corporation, as it was deprived of the testimony of Beauchamp by reason of his disappearance. The testimony of the plaintiff and her husband, S. P. Render, was largely as to transactions with C. P. Beauchamp. The officers of the defendant found the certificates originally issued to the plaintiff either in the stock book or in a drawer with the stock book and across the back of each of them at that time there was marked "transferred." The minutes of the meeting of the corporation on the 1st day of February, 1924, with reference to the stock certificates shows that the stock in question was assigned by J. T. Render to C. P. Beauchamp.

S. P. Render testified that he contracted in writing with C. P. Beauchamp to deliver him 46 shares of stock for $5,000, but that the sale was not consummated. He then testified that he told Mr. Beauchamp. "I will leave these stock certificates in the stock book and you people may vote them"; that he indorsed the certificates in blank and delivered them to Beauchamp; that "that was with the intention of having them re-issue it," and that was the understanding between him and Beauchamp. He testified that Beauchamp acted in the transaction as secretary of the corporation and that the stock certificates were left with him, as secretary of the corporation, to be re-issued on demand.

The witness to the signature of S. P. Render on the stock certificates testified that Mr. Render told Mr. Beauchamp "to take the stock and do the best he could with it and if he succeeded, he could pay him, and if he didn't there was nothing else."

N. I. Sommers, president of the defendant corporation, testified that in the early part of 1926, Mr. Render attended a meeting of the stockholders at which he said, "I have turned over to Mr. Beauchamp my stock and he is handling it and I have nothing in the world to do with it."

Under the provisions of section 5318, C. O. S. 1921, shares or certificates of the capital stock of a corporation are personal property and may be transferred by indorsement by the signature of the proprietor, or his attorney or legal representative, and delivery of the certificates. Such a transfer is valid between the parties thereto.

"Where, however, there is nothing on the face of the certificate to indicate that it is held in trust, a good faith purchaser will ordinarily be protected, though it is in fact trust property." Thompson on Corporations (3rd Ed.) section 4050, and cases therein cited.

The same rule is stated in Cook on Corporations (6th Ed.) section 434.

"If the trustee appears on the books of the corporation as the absolute owner of the shares, and the transferee has no notice, actual or constructive, that he holds the title in trust, he certainly acquires a good title." Fletcher, Cyclopedia Corporations, section 3837, and cases therein cited.

We quote from 14 Corpus Juris, page 785, as follows:

"Where a person holds stock in trust, a purchaser and transferee from him, if he has actual or constructive notice of the trust, takes subject to the equitable rights of the cestui que trust, and is liable to the latter in the full amount of the stock. But a bona fide purchaser without knowledge of the trust will be protected, although the transferrer violates his trust in making the transfer and even though the cestui que trust is an infant at the time of the transfer."

Under that rule the transfer of the certificates of shares from C. P. Beauchamp to Street & Draper was valid and passed the title, unless Street & Draper had actual or constructive notice of the invalidity of the title of C. P. Beauchamp. There is nothing in the record tending to cast suspicion upon the bona fides of the transfer of the certificates from C. P. Beauchamp to Street & Draper and they were purchasers thereof for value. Upon their surrender of the certificates for cancellation they were entitled to have new certificates issued to them in lieu of those surrendered. Litchfield v. Henson Oil Co., 53 Okla. 550, 157 Pac. 137. The corporation, upon the demand of Street & Draper and the surrender of the certificates, canceled the Beauchamp certificates delivered to Street & Draper and issued new certificates to Street & Draper. The corporation could do nothing else under the law, and there could be no liability upon the part of the corporation for having performed its ministerial duty in issuing the new certificates upon the performance of the conditions as aforesaid. Had it refused, it could have been compelled to do so by a court of equity. The liability, if any, of the plaintiff to the

defendant did not arise out of the issuance of the certificates to Street & Draper.

The question is then presented, whether the defendant corporation is liable in damages for issuing the new certificates to C. P. Beauchamp.

A question of fact is presented by the record as to the purpose of the plaintiff in executing the assignments of the stock certificates owned by her and the powers of attorney in blank. She acted at all times through her husband, who was her agent. While he testified that he told Mr. Beauchamp, "I will leave these stock certificates in the stock book and you people may vote them" and that "That was with the intention of having them re-issue it," that testimony is in conflict with admitted facts that are controlling. The evident purpose was not only to place the possession of the stock assigned in blank with Mr. Beauchamp as secretary and treasurer of the corporation, but to authorize the voting of those shares of stock at any meeting. The question then arises whether he was to hold them intact, or whether they were to be canceled on the books of the company and new certificates issued in his name.

In addition thereto we point out from the record the following excerpts, which speak for themselves:

"Q. Now, in April, 1925, you say Mr. Beauchamp transferred to you 15 shares of stock in the Capitol Hill Undertaking Company? A. The company transferred back to me 15 shares. I didn't say Mr. Beauchamp did. Q. Didn't you go over there and talk to Mr. Beauchamp and don't you know as a matter of fact he surrendered 15 shares of his personal stock and had it issued to you on April 11, 1925? A. If he surrendered 15 shares of his Capitol stock I never knew it until I had an auditor go over in 1926, or 1927, and see what had been done. I got the auditor's report."

—and:

"Q. Why did you sign it? A. For re-issue. Q. You meant for this stock to be re-issued? A. As we might call for it and in such denominations as we might want."

Included in the arrangement with Mr. Beauchamp were certificates of stock belonging to S. P. Render, the husband and agent of the plaintiff. He requested of Mr. Beauchamp the re-issuance of 15 shares of stock belonging to him, and the record shows that certificate No. 36 was issued to him under date of April 11, 1925. He testified:

"Q. After that did you call on him for a re-issue? A. I phoned him and told him he had 15 shares of my own stock, and I wanted it to borrow some money on. Q. When was that? A. In April, 1925. According to my notes, certificate No. 36 re-issued to S. P. Render, April 12, 1925, and placed as collateral to Mr. J. C. Jones."

The plaintiff offered in evidence the stub of certificate No. 36, which reads as follows:

CERTIFICATE
No. 36

For 15 Shares
S. P. Render
Dated April 11, 1925.
From Whom Transferred
C. P. Beauchamp
Dated _____ 19___

No. Original    No. Original    No. of Shares
Certificate     Shares          Transferred
_____

RECEIVED  Certificate No.
For _____ Shares
this _____ day of _____ 19 ___
_____
_____

Her husband and agent testified:

"Q. That certificate, for 15 shares, issued to S. P. Render, dated April 11, 1925, transferred from you to C. B. Beauchamp and then transferred or issued to you, how did you get that, by mail? A. I don't recall. The boy seems to think he went after it and I thought I went after it. I don't know who got it. I called up and got it. Whether I went over after it( or sent somebody else after it, I don't recall. Q. That 15 shares was got in April, 1925? A. 1925. Q. Up to that time, I will ask you to state if you heard anything from anybody that Beauchamp was claiming to own this stock? A. Never heard any claim he asserted. Q. This stock you left indorsed there, so it could be re-issued in the name of your wife? A. Yes, as we called for it. Q. That was the understanding between you and Beauchamp? A. Yes. Mr. Billups: That is leading and suggestive. The Court: Please try to avoid that. Q. I will ask you to state if there was any agreement between you and Mr. Beauchamp when you left the certificates about whether or not it should be re-issued, and how? A. Mr. Beachamp was secretary of the corporation and I left them with him as secretary of the corporation to be re-issued on demand as we might make demand for it, after his inability to pay $5,000 for the certificates. He tried to raise the money to pay for it."

From that testimony we must conclude that the husband and agent of the plaintiff had notice that C. P. Beauchamp held the stock certificates in his own name and that the certificates formerly held by the plaintiff had been canceled and new certificates had been issued to C. P. Beauchamp. No objection was made thereto or to that method of handling these certificates.

Under date of January 6, 1927, both the plaintiff and S. P. Render gave a written notice to the secretary of the corporation, from which we quote the following:

"Some months ago I placed in trust with Mr. C. P. Beauchamp the following certificates in the Capitol Hill Undertaking Company:

"Certificate No. 1, $23.00, issued to S. P. Render.

"Certificate No. 2, $1,500.00, issued to J. T. Render.

"Certificate No. 3, $800.00, issued to J. T. Render.

"I find that these certificates, without authority, and in violation of the trust, have been transferred to Mr. Beauchamp, and other certificates issued in lieu thereof."

—and that, under the same date, they gave another notice, from which we quote the following:

"I have already given to you written notice that certain stock certificates belonging to and issued in the name of S. P. Render and J. T. Render were placed formerly in trust with Mr. C. P. Beauchamp, and that these certificates had been transferred to his own name on the books of the company in violation of this trust."

In neither of those notices is it claimed that the certificates were placed with Mr. Beauchamp as the secretary and treasurer of the corporation, and Mr. Render testified:

"Q. You put them into his hands? A. I put them in the secretary's hands. Q. You put them into the hands of C. P. Beauchamp? A. I did not, I put them in the hands of C. P. Beauchamp, secretary of the corporation. Q. You know they were reissued? A. I supposed they were. Q. You had an opportunity during all that time to have gone over there and made an investigation, if you so desired? A. I certainly did."

We must determine the agreement between the plaintiff and Beauchamp. In doing so, we are not bound by the statements of the plaintiff or her witnesses, but may consider all of the competent evidence throwing any light on the subject. Were the certificates of shares delivered to Beauchamp after the assignments and powers of attorney had been signed by Render to be held intact by Beauchamp or the corporation, or were they to be canceled upon the books of the company and new certificates of shares issued to Beauchamp? If the latter is true, there is no liability on the corporation for issuing the new certificates to Beauchamp. If, on the other hand, the arrangement between the plaintiff and Beauchamp was that either Beauchamp or the corporation was to hold the certificates in their original form, the corporation is charged with knowledge of that fact by reason of Beauchamp being the secretary and treasurer of the corporation and is liable for its wrongful act in issuing new certificates to Beauchamp.

The record fairly discloses that one purpose of making the transfer from the plaintiff to Beauchamp was to conceal from the people of Capitol Hill the fact that the plaintiff and her husband were stockholders in the company. They agreed with Mr. Beauchamp that it would be advisable to conceal the fact that they were stockholders in the company and to cause the people of Capitol Hill to think that they had transferred their stock in the corporation and no longer had any interest therein. We must consider that condition of mind and that intent on the part of the plaintiff in determining just what the transaction was between her agent and Mr. Beauchamp. That intent is evidenced by the fact that the stock certificates were assigned and the powers of attorney executed in blank. If Mr. Beauchamp was to act as the agent of the plaintiff and hold the certificates of shares for her and they were not to be canceled or transferred on the books, there was no occasion for the execution of the assignments and the powers of attorney. The fact that the assignments were executed must be given consideration. They must have been executed in order that Beauchamp might have evidence of title to the stocks. Without placing in Beauchamp some evidence of title, the purpose of the plaintiff to deceive the people of Capitol Hill would have been defeated. The evidence tends to show not only that that was the purpose and arrangement, but that plaintiff's agent knew that it was being handled in that way.

In considering the intent of the parties, it is necessary that consideration be given to the required procedure for corporate acts, among which we find section 5339, C. O. S. 1921, which authorizes voting of shares of stock, as shown by the books of the corporation, at least ten days prior to the election or vote taken. The plaintiff could have held her stock, which was of record on the books of the corporation in her name, and could have given someone a proxy to vote that stock for her. That would not have accomplished her purpose to conceal her ownership. She did not do that, but, on the con-

trary, she signed a blank assignment and power of attorney. Since she wanted her stock voted and since she did not give a proxy to anyone to vote it for her, there is but one way that it could have been voted and that would have been for the stock to have been transferred on the books of the corporation at least ten days prior the election or vote. That was the evident plan of the plaintiff and that plan was carried out. The assignments and powers of attorney on the backs of the stock certificates were executed in blank and the stock certificates were delivered to Beauchamp. Beauchamp caused the stock evidenced by the certificates to be transferred on the books of the corporation, under the power of attorney executed in blank, the certificates to be canceled and new certificates to be issued to him, thus placing the stock in his name, concealing the plaintiff's ownership thereof and giving him the legal authority to vote the stock, which, on the statement of the plaintiff's agent, were the purposes of the transfer.

This is further evidenced by the fact that the plaintiff was the vice president and her husband was the president of the corporation and that they retired from office and from participation in the affairs of the corporation and thereafter made no effort to determine what the corporation was doing for a period of more than two years and until they saw in the newspaper a statement with reference to the corporation. At that time Beauchamp had disappeared. They then made a demand upon the corporation to reimburse them for the stock that had been misappropriated by the trustee who had been selected by them to take the legal title to the stock and to hold it for them in trust.

In considering the intent of the parties, due regard must be given to the law with reference to the purchase and holding of shares of stock by a corporation.

A corporation "may purchase, hold and transfer shares of its own stock, from its surplus profits, or by the unanimous consent in writing of all its stockholders, in such manner and for such price or consideration as the said stockholders may unanimously decide upon." Section 5320, C. O. S. 1921. There is nothing in this record to show any surplus profits or unanimous consent in writing of the stockholders either to purchase or to hold shares of its own stock. The corporation was without authority of law either to purchase or hold the shares of stock belonging to the plaintiff, and the transaction between the plaintiff and Mr.

Beauchamp must have been with Mr. Beauchamp as an individual and not with Mr. Beauchamp as the representative or agent of the corporation. Mr. Beauchamp, as secretary or general manager of the corporation, had no authority to make any such arrangements, and had he pretended to act as the agent of the corporation therein, that transaction would have been ultra vires and void. At the time the arrangement was made the plaintiff was the vice president and her husband and agent was the president of the corporation and they knew that Beauchamp had no such authority.

While the managing officers of a corporation are trustees in a certain sense (14-A Corpus Juris, 99, and cases therein cited), that rule is limited to the management of the general corporate affairs and does not extend to dealings with the individual shareowners in respect to their shares of stock (14-A Corpus Juris, 128, and cases therein cited). The officers of the corporation may purchase shares of stock from the stockholders and, in the absence of fraud, those sales will be valid and, even though there is fraud therein, the corporation is not liable therefor, unless the purchase by the officer was made for the benefit of the corporation and within the scope of his authority. In other words, a corporate officer may deal with the stockholder concerning the shares of stock without making the corporation liable therefor.

Since a corporation's officers may not bind the corporation by purchasing the stock of the corporation without express authority, a corporation's officers may not create a liability by taking the legal title to its corporation stock without express authority. In this case there was no authority on the part of the corporation to Beauchamp as to the plaintiff's stock or any other corporate stock.

The corporation is liable for the acts of one of its officers within the scope of the officer's authority, but it is not liable for acts which are not within the limitation of the authority expressly or impliedly conferred upon them, unless those acts are ratified or the corporation becomes bound by estoppel. 14-A Corpus Juris, 349, and cases therein cited. The corporation is bound by the acts of its officers in a transaction relating to corporate stock only when such acts are within the scope of the officers' authority, and is not bound where he acts in his individual capacity. 14-A Corpus Juris, 439.

We have here presented a situation where the president and vice president are said to

have entered into an arrangement with the secretary and general manager whereby the corporation is to become liable in a manner not authorized by the statute and in direct conflict with the provisions of the statute. We cannot approve any such an arrangement, if it existed, and the record shows the arrangement did not exist. The arrangement was between the president and vice president and the secretary and general manager as individuals.

This record clearly shows that this plaintiff was the vice president, her husband and agent was the president, and Beauchamp was the secretary and treasurer of this corporation. They thought it advisable to increase the capital stock and to issue additional stock for the purpose of making improvements in the corporate property. Neither the president nor the vice president was able to aid in that financial program, and they thought that it would be advisable to retire from the corporation management and to transfer their shares of stock so that their interest in the corporation might be concealed and the corporation might thereby be enabled to sell stock to prospective purchasers residing in Capitol Hill who they understood would not purchase as long as they were connected with the corporation. In order to effectuate that plan they entered into the arrangement with their associate, Mr. Beauchamp, whereby the certificates of stock were to be assigned to him and held by him in trust for them for the purpose of representing them in the business affairs of the corporation. If they intended to bind the corporation they should have obtained authority from the stockholders. This they did not do.

The trouble arose when their trusted agent and trustee violated his trust and sold their stock to Street & Draper, after which the plaintiffs began to look for some manner of recovery. Beauchamp was gone, their stock was gone, and they hit upon the plan of trying to make the corporation pay them for the loss they had sustained through the misappropriation of their property by their agent and trustee.

They are confronted, however, with the unsurmountable obstacle that before they may do so they must prove that the individual had authority of the corporation to bind the corporation by the transaction. They cannot rely upon the rule of apparent authority, because they were the president and vice president of the corporation and had full knowledge of the actual authority. There was an absolute failure on their part

to show authority of the agent of the corporation to bind the corporation. The statutes of Oklahoma specifically exclude that authority and it could not have been granted to the agent had the corporation seen fit to do so.

While the trial court either did not see this obstacle, or looked around it, this court is of the opinion that it is an absolute bar to the right of recovery.

Beauchamp violated the trust by selling the certificates to Street & Draper. Evidently Beauchamp is liable to the plaintiff for the damage she sustained thereby. The plaintiff may not recover additional shares of stock because all of the shares of stock authorized by section 39, article 9, of the Constitution of Oklahoma are now outstanding, and to issue to the plaintiff the stock claimed by her would be to cause stock to be issued without "money, labor done, or property actually received to the amount of the par value thereof," something that no court of equity may require.

We realize that there are cases holding that a court of equity may require the issuance of stock within the limitations of the authorized stock, but no court has ever held that stock may be issued in addition to the authorized stock. Such stock, under our decisions, is void. Pruitt v. Oklahoma Steam Baking Co., 39 Okla. 509, 135 Pac. 730. We know of no decision holding that stock may be issued in violation of the constitutional restriction upon issuance thereof. We think the constitutional restriction is controlling and that such stock would be void.

We will not attempt to analyze all of the authorities cited by the plaintiff. They have all been answered by the citations herein made. State National Bank v. Scales, 60 Okla. 225, 159 Pac. 925, dealt with the transfer of shares of stock held in trust. It did not appear that any money was paid or other consideration given for the pledge of the stock. After the pledge the account of the pledgor was overdrawn, but the overdraft was thereafter liquidated. There was then no consideration for the pledge, and this court refused to permit the stock to be sold for an indebtedness incurred by the pledgor prior to the time of the pledge. There is nothing in that case that is at all controlling on the situation presented by this record. While it was stated in that decision that a certificate of stock is not invested with the sanctity of commercial paper, there is nothing therein intended to hold that a person who receives stock for a valuable

consideration, without notice of the trust, takes subject to the trust.

We are not concerned with the cases cited dealing with the question of estoppel. The plaintiff had both the legal and equitable title to her shares of stock. She placed the legal title in C. P. Beauchamp, and Beauchamp, by regular conveyances, transferred that legal title to Street & Draper. While she retained the equitable title as against C. P. Beauchamp, she would be estopped to assert that equity as against Street & Draper, and she has not attempted to do so. They are not parties to this litigation. She is here attempting to hold this corporation liable in an action in equity for damages she sustained by reason of the breach of trust of her agent and trustee.

Bentley v. Zelma Oil Co., 76 Okla. 116, 184 Pac. 131, involved the cancellation of a well-drilling contract and assignments of an oil and gas lease for fraud. The question of dealing with corporate stock was not therein involved, and there is nothing therein holding that a corporation occupies the position of trustee of the issued stock of its various stockholders.

Western Union Telegraph Co. v. Davenport, 97 U. S. 369, dealt with the question of forged transfers and is no wise in point.

What we consider to be a fair statement of the distinction between trustees disclosed by the certificates and undisclosed trustees is set out in West v. Tintic Standard Mining Co. (Utah) 263 Pac. 490, in which that court said:

"This brings us to the real controversy, and the one chiefly urged by the defendant. It is contended that the indorsement on Certificate No. 370 appearing to transfer it to 'David Jenson, trustee,' did not put the defendant on notice that Jenson was not, but that another was, the true owner of it, nor put the defendant on inquiry to ascertain the true owner, or as to the right or authority of Jenson to surrender it up and to have it canceled, nor did the indorsement of 'David Jenson, trustee,' on the certificates issued in lieu of the original certificate put the defendant on notice or inquiry that Jenson had not the right or authority to transfer the certificates, or that he was not the lawful holder or owner thereof; and that plaintiff's only remedy was against Jenson for a breach of trust and confidence reposed in him by the plaintiff. To support the contention, the appellant chiefly relies on the following cases; Brewster v. Sime, 42 Cal. 139, 14 Mor. Min. Rep. 573; Thompson v. Toland, 48 Cal. 99, 2 Mor. Min. Rep. 77; Fletcher v. Kidder, 163 Cal. 769, 127 Pac. 73; Northwestern Portland Cement Co. v.

Atlantic Portland Cement Co., 174 Cal. 308, 163 Pac. 47; Valleyview Consol. Gold Mining Co. v. Whitehead, 66 Colo. 237, 180 Pac. 737; Shattuck v. American Cement Co., 205 Pa. 197, 97 Am. St. Rep. 735, 54 Atl. 785; Union Trust Co. v. Oliver and Oberg, 214 N. Y. 517, 108 N. E. 809; Beckwith v. Galice Mines Co., 50 Or. 542, 16 L. R. A. (N. S.) 723, 93 Pac. 453; Smith v. Nashville & D. R. Co., 91 Tenn. 221, 18 S. W. 546; Hickok v. Cowperthwait, 210 N. Y. 137, 103 N. E. 1111, Ann. Cas. 1915B, 1002, Grafflin v. Robb, 84 Md. 451, 35 Atl. 971.

"The cited California cases support the views of the defendant. The next six cited cases are to the effect that a blank indorsement by a record holder of a certificate of stock makes the certificate transferable by delivery, and the purchaser, or the person to whom it is delivered, may write in the blank the name of any person as assignee or transferee, and lawfully transfer it, or where the record owner of stock places his certificate indorsed by himself in blank in the hands of another to dispose of it for a prescribed purpose, and the agent or the person to whom it is delivered, disregarding the direction of the principal, pledges the certificate as security for a loan to himself, or sells it, and converts the proceeds to his own use, the owner is estopped to assert title as against such a bona fide holder for value and without notice of any limitation upon the authority of the agent or person to whom the certificate was delivered and indorsed in blank by the record owner. But in these cases—and there are others of the same import—it is to be noticed that the name of the assignee or transferee inserted or appearing in the blank indorsement was merely his name as the lawful transferee without any restriction or qualification, such as 'trustee' or otherwise, and without anything appearing on the certificate to indicate or give notice of any want of, or restricted, authority on the part of the transferee to sell or transfer or otherwise dispose of the certificate, or to limit his apparent ownership or right to sell or otherwise dispose of it. In other words, in such cases there is not anything on the record of the company, nor on the certificate, to give notice or any warning that the transferee is not the lawful owner and holder of the certificate; and hence when so presented for transfer on the books of the company, the company is justified in treating such transferee as the lawful owner, unless it otherwise has knowledge or notice to the contrary."

Cited therein is the case of Valleyview Consol. Gold Min. Co. v. Whitehead, 66 Colo. 237, 180 Pac. 737, wherein that court held:

"Signing by record holder of blank indorsement of certificate of stock makes the certificate transferable by delivery and the holder of it by purchase the equitable owner, as against the corporation, and

he may lawfully write in the blank the name of any person as assignee or as attorney in fact. The transfer, on the corporation's books, of shares represented by an indorsed certificate of stock, perfects the title of the holder of the certificate, and the holder of the certificate issued on such transfer is, as to the corporation, the legal and equitable owner of the shares.

"Under Rev. St. 1908, sec. 870, the duty of the secretary of a corporation as to indorsed certificates of stock presented for transfer is purely ministerial, and the corporation is under no duty, prior to transfer on its books, to determine the title to the shares, and if an attorney to make the transfer violated his instructions, that is a matter between him and his principal; the authority given to him by the power of attorney in the indorsement being ample to protect the corporation in transferring the stock."

The facts in that case are similar to the one at bar. The plaintiff therein transferred to the president of the corporation two certificates of shares indorsed in blank by her vendor, in whose name the certificates had been issued, to be delivered by him to the company for transfer. He became thereby her agent for that purpose. The court said:

"When the certificates, indorsed as stated, with the blanks filled in as suited the holder, were presented to the secretary, his duty was to take them up and make the proper entries on the transfer book, as directed by the attorney. When that was done, the transferees were shareholders, and the company was then under obligation to issue the certificates evidencing their ownership. It was no part of the company's duty to determine the title to the shares prior to the transfer on its books. If an attorney to make the transfer violated his instructions, that is a matter between him and his principal to be determined in a proper action. McNeil v. Bank, 46 N. Y. 325, 7 Am. Rep. 341. The authority given him by the power of attorney is ample to protect the company in any attack on its action in the premises. It did only what the law required of it. This appears to be the general rule as to transfers of stock.

"In Telegraph Co. v. Davenport, 97 U. S. 369, 24 L. Ed. 1047, it is said:

"'The officers of the company are the custodians of its stock books, and it is their duty to see that all transfers of shares are properly made, either by the stockholders themselves or persons having authority from them.' From these considerations it results that if Stewart undertook to present the shares for transfer on the company's books, for the benefit of plaintiff, as she claims he did, and violated her instructions as to the transfer, he, and not the company, is liable for such breach of duty."

It will be noted from the Colorado case that the president of the corporation was held to be the agent of the plaintiff.

For this corporation to pay the plaintiff would be to deprive the stockholders of this corporation of their property in violation of the statutes of Oklahoma. The stockholders never at any time authorized either the corporation or any of its officers or agents to buy, deal in, take or hold any of the stock of this corporation. To sustain the judgment of the trial court would mean to hold that a stockholder in a corporation might enter into an agreement with an officer of the corporation with reference to his stock whereby the corporation, without the consent of the other stockholders, would become liable for the payment of that stock. This amounts to doing indirectly something that cannot be done directly and that is in direct violation of the statutes of Oklahoma. We cannot give our approval to it.

There being no evidence in the record from which this court can conclude that this corporation ought to pay the plaintiff for the property wrongfully taken from her by her agent, C. P. Beauchamp, the judgment of the trial court is reversed, and the cause is remanded, with directions to dismiss this action.

HEFNER, CULLISON, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., and CLARK, V. C. J., absent. RILEY, J., not participating.