2012 OK CIV APP 58

**Larry SMOOT; Connie Smoot and C & L Restoration Services, LLC, Plaintiffs/Appellees,**

v.

**B & J RESTORATION SERVICES, INC., a/k/a B & J Restoration, Inc.; Hopper Properties, LLC; Brandon Hopper and Julie Hopper, Defendants/Appellants.**

**No. 106,368.**

Court of Civil Appeals of Oklahoma, Division No. 4.

May 16, 2012.

Jasen R. Corns, Jenks Law, P.L.L.C., Jenks, Oklahoma, for Plaintiffs/Appellees.

Mark D. Lyons, Lyons & Clark, Inc., Tulsa, Oklahoma, for Defendants/Appellants.

JOHN F. FISCHER, Chief Judge.

¶1 Defendants, B & J Restoration Services, Inc., and Brandon and Julie Hopper, appeal a judgment entered on a verdict rendered in favor of Plaintiffs, Larry and Connie Smoot and their company C & L Restoration Services, LLC (collectively the Smoots), on the Smoots' breach of contract claim. The Hoppers and B & J also appeal a post-trial order overruling their motion for judgment notwithstanding the verdict. In substance, the Hoppers contend they are not personally liable in this action and all three Defendants challenge the amount of damages awarded to the Smoots. Finally, by an amendment to their petition-in-error, the Defendants also appeal a post-trial judgment awarding the Plaintiffs costs and attorney fees. We affirm the judgment as to the Hoppers' personal liability for breach of the non-compete provisions of the parties' agreements, reverse as to the Hoppers' liability for breach of the remaining provisions of those agreements, reverse as to the amount of damages awarded, and remand for further proceedings to determine the proper amount of damages. As a result, we vacate the amount of attorney fees awarded to the Smoots and remand for determination of the proper amount of fees to be awarded at the conclusion of the proceedings in the district court on the issue of damages.

## BACKGROUND

¶2 The Hoppers were in the cleaning and restoration business. They owned and operated their business through B & J and a franchise known as ServPro. The corporation owned title to the franchise and the assets associated with the business. B & J conducted business under the trade name ServPro of Central Tulsa County. The Smoots wished to purchase the Hoppers' business and ultimately two contracts were executed documenting the purchase and sale, a Purchase Agreement and an Agreement Not to Compete and Training Agreement (Restrictive Covenant). Subsequent to the transfer of ownership, a dispute developed and the Smoots filed this action. At the conclusion of the trial, the district court sustained the Defendants' motions for a directed verdict as to the Smoots' theories of recovery for rescission, unjust enrichment, detrimental reliance and intentional interference with prospective economic advantage and/or business relations, but submitted the Smoots' fraud and breach of contract theories to the jury. The jury returned a verdict in favor of the Defendants on the fraud theory, but found for the Smoots on their breach of contract theory assessing damages against the Hoppers and B & J in the amount of $260,000 for breach of the Purchase Agreement, and $100,000 for breach of the Restrictive Covenant. The Hoppers and B & J appeal the judgment entered on the verdict and the district court's order denying their motion for judgment notwithstanding the verdict.

## STANDARD OF REVIEW

¶3 This appeal raises essentially two issues: (1) the Hoppers' personal liability for the judgment, and (2) the appropriate measure of damages. Defendants challenge both the legal correctness of the district court's instructions to the jury and the sufficiency of the evidence supporting the verdict in favor of the Smoots.

In an action at law, a jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the verdict of the jury, this Court will not disturb the jury's verdict or the trial court's judgment based thereon.

*Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.,* 1997 OK 7, ¶3, 933 P.2d 282, 287. "The sufficiency of the evidence to sustain a judgment in an action of legal cognizance" is determined by an appellate court in light of the evidence tending to support it, "together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it." *Park v. Sec. Bank and Trust Co.,* 1973 OK 72, ¶21, 512 P.2d 113, 118.

¶4 The challenges on appeal were also reurged in Defendants' motion for judg-

ment notwithstanding the verdict. "The standard for determining a motion for judgment notwithstanding the verdict (JNOV) is identical to the standard for determining a motion for directed verdict." *First Nat'l Bank in Durant v. Honey Creek Entm't Corp.*, 2002 OK 11, ¶ 8, 54 P.3d 100, 102. Therefore, the determination of whether the Defendants' motion for judgment notwithstanding the verdict should have been granted depends on the correctness of the district court's disposition of the Defendants' motion for directed verdict. "When a motion for a directed verdict made at the close of all of the evidence should have been granted, the court shall, at the request of the moving party, grant judgment in the moving party's favor...." 12 O.S.2011 § 698. *See McInturff v. Oklahoma Natural Gas Transmission Co.*, 1970 OK 169, ¶ 9, 475 P.2d 160, 162.

> A motion for directed verdict ... should not be sustained unless there is an entire absence of proof tending to show a right to recover; and in passing thereon, a trial court must consider as true all of the evidence favorable to the party against whom the motion ... is directed, together with all inferences that reasonably may be drawn therefrom, and must disregard all conflicting evidence favorable to the movant.

*Downing v. First Bank in Claremore*, 1988 OK 67, ¶ 8, 756 P.2d 1227, 1229. The standard in an appellate court for reviewing the correctness of the district court's ruling on a motion for directed verdict is the same as the standard used by the district court. *First Nat'l Bank in Durant*, 2002 OK 11, ¶ 8, 54 P.3d at 102; *Spradlin v. American Travelers Ins. Co.*, 1961 OK 223, ¶ 13, 376 P.2d 323, 328. Finally,

> Instructions are explanations of the law of a case enabling a jury to better understand its duty and to arrive at a correct conclusion. When reviewing allegedly erroneous jury instructions, this Court must consider the instructions as a whole. We look to whether the instructions reflect the law on the relevant issue, not whether the instructions were perfect.

*Bierman v. Aramark Refreshment Servs., Inc.*, 2008 OK 29, ¶ 22, 198 P.3d 877, 884–85.

## ANALYSIS

¶ 5 In their effort to purchase the Hoppers' business, the Smoots contacted Sunbelt Business Brokers. Sunbelt is a national business brokerage firm that the Hoppers hired to sell B & J. The Smoots submitted a series of written offers on printed Sunbelt forms. The offers and negotiations specific to this transaction are reflected on these forms by hand-written additions, modifications and interlineations. These documents are variously signed by one or both of the Smoots and one or both of the Hoppers without indication that any signatory is signing in a representative capacity. Although Sunbelt was paid by B & J and represented the Hoppers throughout the sale, the Sunbelt offer forms state that if the parties did not understand the document, they should consult an attorney because Sunbelt was not authorized to give legal advice. The negotiations resulted in the execution of the Purchase Agreement and Restrictive Covenant concluding the sale. These agreements were drafted by Sunbelt's general counsel. The closing of the sale was also conducted by Sunbelt's general counsel.

¶ 6 The Purchase Agreement recites that it is an agreement between B & J, as the Seller, and Connie and Larry Smoot, as Buyer. A Certificate of Consent authorizes Connie and Larry Smoot to execute the Purchase Agreement on behalf of C & L. The agreed purchase price is $260,000, allocated among six categories, including goodwill, the franchise, business property and a covenant not to compete. The Purchase Agreement recites that the parties had previously entered into a non-binding term sheet concerning the sale that will be replaced by the Purchase Agreement. The Purchase Agreement is signed by Brandon and Julie Hopper as Sellers and by Larry and Connie Smoot as Buyers. At the bottom of each page of the Purchase Agreement is a signature line following: "Seller Initials." The initials of Brandon and Julie Hopper appear on each line.

¶ 7 At trial, Sunbelt's general counsel testified that she prepared the Purchase Agreement and handled the closing. The general

counsel testified that she mistakenly omitted B & J's corporate designation in the signature block at the end of the document, and the designation of Brandon Hopper as president and Julie Hopper as secretary of that corporation on their respective signature lines. The Purchase Agreement contains a provision reciting that it is the entire agreement between the parties and that all prior "negotiations and understandings" are merged into the Purchase Agreement. The Restrictive Covenant, executed approximately forty-five days after the Purchase Agreement was signed, identifies C & L as the Buyer and B & J as the Seller. The Restrictive Covenant is signed by Connie L. Smoot as managing member for C & L and Brandon Hopper as president of B & J. There are no other signatories to the Restrictive Covenant. The Restrictive Covenant recites that it is further consideration for the assets being purchased by the Smoots as specified in the Purchase Agreement.[1] The Restrictive Covenant states that each party has contributed to its preparation and that neither party is to be considered the exclusive drafter of the agreement.

### I. The Hoppers' Personal Liability.

■■■ ¶ 8 Two theories of recovery against the Hoppers personally were presented to the jury, fraud and breach of contract. The jury returned a verdict in favor of the Hoppers on the fraud theory. Therefore, if the Hoppers are personally liable, it is only on the breach of contract theory. The Hoppers argue that they cannot be held personally liable for breach of either agreement. This argument is not based on the contention that there is no competent evidence to support the finding that the agreements were breached, and the record would not support such a contention. Rather, the Hoppers argument is limited to a legal issue; whether the Hoppers can be held personally liable for the breach of those agreements. That issue requires construction of the Purchase Agreement and the Restrictive Covenant. "Generally, the terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense...."

*Osprey v. Kelly–Moore Paint Co. Inc.,* 1999 OK 50, ¶ 13, 984 P.2d 194, 198. "A contract should be construed to carry out the intention of the parties at the time the contract was made." *Oxley v. Gen. Atlantic Res., Inc.,* 1997 OK 46, ¶ 14, 936 P.2d 943, 945. The interpretation of a contract is a matter of law. *Corbett v. Combined Commc'ns Corp. of Oklahoma, Inc.,* 1982 OK 135, ¶ 5, 654 P.2d 616, 617. An appellate court has the "plenary, independent, and nondeferential authority to re-examine" the district court's legal rulings. *Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.,* 1996 OK 125, n. 1, 932 P.2d 1100.

### A. The Purchase Agreement

■■ ¶ 9 There are three relevant components to the Purchase Agreement: (1) the agreement to transfer assets and the franchise (Articles I, II and IV), (2) an agreement by the Seller not to compete with the Buyer for a period of five years and within or thirty miles beyond the border of Tulsa County (Article III.A), and (3) representations and warranties by the Seller (Article VI). There was conflicting evidence regarding the Hoppers' liability for breach of the Purchase Agreement. The Purchase Agreement states that B & J is the Seller, but the agreement is signed by Brandon and Julie Hopper without any reference to their representative capacities as officers of B & J. If possible, a court must interpret a written contract from the language of the contract alone. 15 O.S.2011 § 155. The drafter of the Purchase Agreement testified that because of a mistake, she failed to include B & J's corporate designation, or a designation that the Hoppers were signing in their corporate capacities as B & J officers, in the signature block at the end of the agreement. Parol evidence cannot be offered to vary, modify or contradict the written terms of a contract. *Ollie v. Rainbolt,* 1983 OK 79, ¶ 12, 669 P.2d 275, 279. Nonetheless, in this limited respect, the drafter's testimony does not contradict a written term of the agreement. Although it is customary to identify the capacity in which parties to a contract are

---

1. The Restrictive Covenant actually refers to an Asset Purchase Agreement. However, no party contends that this refers to any document other than the Purchase Agreement.

signing the contract, there is no provision in the Purchase Agreement that states the Hoppers are signing that agreement in their individual capacities. In that respect, the Purchase Agreement is silent. "When through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded." 15 O.S.2011 § 156.

¶ 10 Further, when interpreting a contract, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." 15 O.S.2011 § 157. Reviewing the Purchase Agreement in its entirety, we conclude that had the parties intended that the Hoppers sign the Purchase Agreement in their individual capacities, the separate language in Article III.A providing that the person signing on behalf of the Seller had authority to bind individuals would not be necessary. Because the Hoppers are the only two officers, directors and shareholders of B & J, a construction of the signature page of the Purchase Agreement finding the Hoppers signed as individuals would be inconsistent with the plain language of Article III.A. That conclusion is consistent with related documents in the record, including a resolution authorizing B & J to enter into the Purchase Agreement, signed by Julie Hopper as secretary; a document transferring B & J's trade name, one of the assets Purchased by the Smoots, to C & L that is signed by Brandon Hopper as president and Julie Hopper as secretary; an agreement by B & J to split the $8,000 franchise transfer fee, signed by Brandon Hopper as president, and a settlement statement showing disbursement of the $260,000 purchase price, signed by Brandon Hopper as President of B & J. "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." 15 O.S.2011 § 158. We find that the intent of these parties was for Brandon and Julie Hopper to sign the Purchase Agreement in their representative, not individual capacities. However, this finding does not resolve the issue of the Hoppers' personal liability for breach of the Purchase Agreement.

## B. The Non–Compete Provisions

¶ 11 Article III.A of the Purchase Agreement provides, in part: "Seller covenants not to compete as an individual, officer, employee, investor, or in any other capacity or in a corporation or any other entity which engages in the business covered by this agreement. . . ." Even though the Hoppers signed the Purchase Agreement in their representative capacities as corporate officers, they could still be liable if they personally undertook any obligations of the corporation. "Officers of a corporation are not generally liable to third persons if they act within the power and purpose of the corporation and do not purport to bind themselves individually." *Seitsinger v. Dockum Pontiac Inc.*, 1995 OK 29, ¶ 10, 894 P.2d 1077, 1080. The end of Article III.A of the Purchase Agreement contains the following language:

> These obligations [not to compete] also extend to each officer, director, and shareholder or other owner or partner of Seller, and Seller represents and warrants that it has the authority to bind such officers, directors, shareholders, partners and owners to these terms.

It is undisputed that Brandon and Julie Hopper were the only two officers, directors, shareholders and owners of B & J. And, because they were the only signatories to the Purchase Agreement, they are the only parties who could represent to the Smoots that the "officers, directors, shareholders and owners of B & J" were bound by the terms of the covenant not to compete.

¶ 12 In any agreement to purchase another's business, the essential purpose of a covenant restraining future competition by the seller is to permit the buyer to receive the benefit of the bargain, that benefit being the right to conduct the business without interference from the individuals who previously conducted that business. This purpose is lawful and consistent with this State's public policy. "One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business . . . so long as the buyer, or any person deriving title to the goodwill from him carries on a

like business therein." 15 O.S.2011 § 218. Consequently, even though the Hoppers signed the Purchase Agreement in their representative capacities, they expressly agreed to be personally liable for any breach of Article III.A of the Purchase Agreement.

¶ 13 The Purchase Agreement also contemplates and requires the execution of a separate confidentiality and non-competition agreement after approval of the sale by the Hoppers' franchisor. That agreement is the Restrictive Covenant and the parties to that agreement are also B & J and C & L. The Restrictive Covenant contains the identical language contained in Article III.A of the purchase agreement in addition to provisions by which the "Seller" agreed to provide post-sale training. However, unlike the Purchase Agreement, the signature block on the Restrictive Covenant clearly identifies B & J as the Seller and indicates Brandon Hopper signed that agreement in his capacity as President of B & J. Nonetheless, the Restrictive Covenant contains the language from Article III.A of the Purchase Agreement representing the Seller's authority to bind corporate officers and shareholders of B & J. Brandon Hopper does not contend that when he signed the Restrictive Covenant in his capacity as President of B & J, he did not have authority to bind himself individually as a corporate officer to the terms of that agreement. Nor does he contend that he did not have authority to bind Julie Hopper, B & J's corporate secretary, to the non-compete terms of that agreement. The language of this provision is clear and the consequences of the undertaking are unambiguous.

■ ¶ 14 The Hoppers' only additional argument concerning their personal liability for breach of the Restrictive Covenant is that "Julie Hopper's name does not appear anywhere on" that agreement.[2] That fact is not dispositive. There is no evidence, and the Hoppers do not argue that Brandon Hopper falsely represented to the Smoots his authority to bind Julie Hopper, a corporate officer,

to the terms of the Restrictive Covenant when he signed that agreement as President of B & J. Ultimately, the Hoppers' argument in this regard is immaterial. The contractual obligation in the two agreements is identical. And the fact that Julie Hopper might not be personally liable for a breach of the Restrictive Covenant would not absolve her of liability for breach of Article III.A of the Purchase Agreement. The Smoots presented evidence that the Hoppers diverted business and hired employees from B & J subsequent to the sale in breach of the covenant not to compete. The Hoppers are personally liable for the breach of Article III.A of the Purchase Agreement and the identical provision in the Restrictive Covenant.

## C. The Asset Transfer and Training Provisions

■ ¶ 15 Finding that the Hoppers are personally liable for breach of the non-compete provisions does not resolve their liability for breach of the other terms of the Purchase Agreement or the Restrictive Covenant. To resolve that issue, we must determine whether there is evidence to support the verdict based on the Hoppers' status as shareholders or their conduct as corporate officers and directors. In general, shareholders of a corporation may be liable for the corporation's breach of contract where the corporation has been used to perpetrate fraud, operated as an instrumentality to conduct the shareholders' personal business or used to defeat public policy. "Courts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." *Fanning v. Brown*, 2004 OK 7, ¶ 16, 85 P.3d 841, 846–47.

■ ¶ 16 Officers and directors are not generally liable for a corporation's breach of contract absent some wrongful personal

2. Defendants also object to the form of the verdict used by the trial court. Such objections must be made before the jury is discharged or the objection is waived. *Morgan v. Okla. Natural Gas Co.*, 1977 OK 49, ¶ 4, 561 P.2d 1363, 1365; *Schuman v. Chatman*, 1938 OK 605, ¶ 0, 184

Okla. 224, 86 P.2d 615 (Syllabus 1). Because Defendants first raised their objection to the verdict form in their motion for judgment notwithstanding the verdict after the jury was discharged, we will not address this contention.

conduct on which liability can be imposed, or unless they voluntarily assume some corporate obligation. "In most instances the officers of a corporation are not liable to its creditors or third persons for corporate acts or debts where they do not purport to bind themselves individually." *Hall v. Sullivan–Dollars, Inc.,* 1970 OK 97, ¶ 6, 471 P.2d 453, 455. Corporate officers may be personally liable for debts incurred by the corporation where they failed to maintain the corporation's authority to conduct business. *State Insurance Fund v. AAA Engineering & Drafting, Inc.,* 1993 OK 142, 863 P.2d 1218. And, corporate officers may be individually liable for their tortious conduct even if they are acting on behalf of the corporation and regardless of whether a corporation may be held vicariously liable for the torts of its officers and directors.[3]

¶ 17 The Smoots argue that the Hoppers are personally liable because they exceeded their corporate authority in using the Serv-Pro franchise to conduct construction and remodeling as well as cleaning operations and concealed that fact thereby inflating the purchase price. The Hoppers deny any wrongdoing and rely on the general principle that a corporation is a legal entity distinct from its officers, directors and shareholders. *See Seitsinger v. Dockum Pontiac Inc.,* 1995 OK 29, ¶ 10, 894 P.2d 1077, 1079–80. They argue, as the district court properly instructed the jury, a corporation can only act through its officers, directors and employees. *See Magnum Foods, Inc. v. Cont'l Cas. Co.,* 36 F.3d 1491, 1499 (10th Cir.1994) (applying Oklahoma law). Finally, they contend that even a closely held corporation "is a separate and distinct entity from its shareholders." *Sautbine v. Keller,* 1966 OK 209, ¶ 15, 423 P.2d 447, 451. As stated, these well recognized principles are not without exceptions.

### 1. Status as Shareholders

¶ 18 The Smoots' argument that the Hoppers exceeded their corporate authority and misrepresented the value of B & J is not an argument addressed to the Hoppers' status as shareholders. Further, the record does not show that the Hoppers are liable merely because they are the sole shareholders of B & J. The jury found they had not committed fraud, there is no evidence that the Hoppers failed to observe corporate formalities and operated B & J as their personal business, and the Smoots have not pointed to any public policy that would be defeated by recognizing B & J as a legitimate corporation. *Cf. Fanning v. Brown,* 2004 OK 7, ¶ 17, 85 P.3d 841, 847 (allegation that shareholders operated corporation to defeat public policy of protecting nursing home resident from injury sufficient to state a claim for relief). Consequently, the Smoots have not established any basis on which to disregard B & J's corporate structure and impose individual liability on the Hoppers as shareholders of the corporation for breach of B & J's contractual obligations.

### 2. Conduct as Officers

¶ 19 With respect to the Hoppers' conduct while acting on behalf of the corporation, there are three potential sources of liability: they either agreed to be bound, their conduct was tortious, or they exceeded their authority. We find none of these circumstances to support the judgment against the Hoppers other than as previously discussed. First, there is no language in the

---

3. *See Pate v. Alian,* 2002 OK CIV APP 68, ¶ 20, 49 P.3d 85, 89 (party injured by intoxicated driver may recover from corporate officer and owner of a restaurant if officer neglected to perform his duties in serving alcohol to driver); *Preston–Thomas Constr., Inc. v. Central Leasing Corp.,* 1973 OK CIV APP 10, ¶ 10, 518 P.2d 1125, 1127 (corporate officer liable for conversion of third-party's property while acting on behalf of the corporation); *All American Car Wash, Inc. v. Nat'l Pride Equip., Inc.,* 550 F.Supp. 166 (W.D.Okla.1981) (corporate officers personally liable if they took part in the commission of a tort or directed officers, agents or employees of the corporation to engage in such acts). *See also Martin v. Johnson,* 1998 OK 127, ¶ 32, 975 P.2d 889, 896–97 ("If an employee acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer we can divine no reason that the employee should be exempt from a tort claim for interference with contract."); *Henry W. Ballantine, Ballantine on Corporations* § 112 (1946) ("An officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf.").

Purchase Agreement or the Restrictive Covenant similar to the last sentence of Article III.A by which the Hoppers voluntarily assumed personal liability with respect to the asset transfer and training provisions. The same is true with respect to the representations and warranties contained in the Purchase Agreement. Second, the Smoots' characterization of the Hoppers' conduct is consistent with a claim for fraudulent misrepresentation. And, much of the testimony at trial concerned whether the Smoots could have determined from the documents presented prior to the sale that a substantial portion of B & J's reported income was derived from construction and remodeling projects performed in conjunction with franchise cleaning operations, or were prevented from determining that fact by the concealment of the relevant documents until after the sale. The Smoots' fraud theory was presented, and the jury returned a verdict in favor of the Hoppers. The Smoots did not appeal the judgment entered on that verdict. *See Conaway v. Thomas,* 1924 OK 367, 101 Okla. 227, 224 P. 965 (parties who fail to appeal are deemed to acquiesce in the judgment). That leaves the Smoots' claim that the Hoppers are personally liable because they exceeded their authority as officers and directors of B & J.

¶ 20 Third, the circumstances pursuant to which a corporate officer acting without corporate authority may be liable to a third-party, as opposed to the corporation, do not apply.

> The rule that where an agent enters into a contract in his or her own name for an undisclosed principal, the other party to the contract may hold the agent personally liable applies equally well to corporate officers or agents. In other words, the rule is that one who claims to be acting in a corporate capacity has the duty to disclose that he or she is contracting as an agent of the corporation and not as an individual.

*William M. Fletcher, Cyclopedia of the Law of Private Corporations* § 1120 (1931) (footnotes omitted). Likewise, the Restatement provides:

> When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal,
>
> (1) the principal and the third party are parties to the contract; and
>
> (2) the agent is not a party to the contract unless the agent and third party agree otherwise.

Restatement (Third) of Agency § 6.01 (2006). However, where the agent fails to disclose that authority, the agent may be personally liable. *Id.* § 6.03. Oklahoma has followed this principle. *See Capitol Hill Undertaking Co. v. Render,* 1931 OK 71, ¶ 33, 149 Okla. 132, 299 P. 854, 860 (holding that corporate secretary may be liable for converting the plaintiffs' stock but "[t]here was an absolute failure on [the plaintiffs'] part to show authority of the agent of the corporation to bind the corporation"). It is undisputed that the Hoppers disclosed the existence of B & J in this transaction. Further, although the Smoots allege the Hoppers exceeded their corporate authority in the operation of a ServPro cleaning franchise, they produced no evidence that the operations of B & J were limited to cleaning operations or that conducting construction and remodeling operations was prohibited by B & J's certificate of incorporation.

> [E]very corporation, its officers, directors and shareholders shall possess and may exercise all the powers and privileges granted by the provisions of the Oklahoma General Corporation Act or by any other law or by its certificate of incorporation, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth in its certificate of incorporation.

18 O.S.2011 § 1015. Finally, Instruction 7.5 of the Oklahoma Uniform Jury Instructions (OUJI) sets out this rule:

> If you find that [name of agent or employee] [was the agent of [name of principal or employer]] [and] [was acting within the scope of [his/her] authority] at the time of the occurrence, and if you find [name of agent or employee] is liable, then both are liable. If you find that [name of agent or

employee] is not liable, then neither is liable.

If you find [name of agent or employee] is liable, but [was not an agent of [name of principal or employer]] [or] [was not acting within the scope of [his/her] authority as an agent of [name of principal or employer]] at the time of the occurrence, then [name of principal or employer] is not liable.

Although OUJI 7.4 tying the corporation's liability to the liability of its agent was given to the jury, Instruction 7.5 providing a basis for liability of the agent independent of the corporation was not given, and there is no evidence in this record that the Smoots requested that it be given.

¶ 21 Consequently, we find no basis on which to hold the Hoppers personally liable for B & J's breach of the Purchase Agreement and Restrictive Covenant except with respect to the non-compete provisions previously discussed. The Hoppers' motion for judgment notwithstanding the verdict should have been granted in this respect. This conclusion does not preclude any future attempt by the Smoots to collect their judgment against B & J from the Hoppers where authorized by law. For example:

A. When the officers, directors or shareholders of any corporation shall be liable by the provisions of the Oklahoma General Corporation Act to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any one or more of them, and the petition shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally.

B. No suit shall be brought against any officer, director or shareholder for any debt of a corporation of which he is an officer, director or shareholder, until judgment is obtained therefor against the corporation and execution thereon returned unsatisfied.

18 O.S.2011 § 1124. However, the Hoppers' potential liability for satisfying the judgment entered against B & J is a different issue than their personal liability for breach of the contracts and the former is beyond the scope of this appeal.

## II. The Jury Instructions

¶ 22 Defendants raise on appeal the sufficiency of the instructions regarding damages for breach of both the Purchase Agreement and the Restrictive Covenant. The test on appellate review of a district court's instructions is whether it appears that the jurors were misled and thereby reached a different conclusion than they would have reached had they been properly instructed. *Woodall v. Chandler Material Co.,* 1986 OK 4, ¶ 13, 716 P.2d 652, 654.

### A. Breach of Contract Damages

¶ 23 Defendants claim that the district court failed to instruct the jury on the law as to the measure of damages. The issue is whether the district court erred by omitting the last sentence from OUJI No. 23.51, "General Measure of Damages." That instruction provides:

If you decide for [Plaintiff] on [his/her/its] claim for breach of contract, you must then fix the amount of [his/her/its] damages. This is the amount of money that is needed to put [him/her/it] in as good a position as [he/she/it] would have been if the contract had not been breached. In this case, the amount of damages should be determined as follows: [set out the appropriate measure of damages].

¶ 24 The district court did not include "the appropriate measure of damages" in its Instruction No. 22 given the jury. And, in no other instruction did the district court instruct the jury on the method to be used to calculate the Smoots' damages for breach of the two contracts. There is discussion in the record that the method of calculating damages would be provided in the verdict forms. However, the Blue Verdict form submitted for returning a verdict in favor of the Smoots on their breach of contract claims provided no additional information to the jury as to how to calculate damages.

¶ 25 Whenever the OUJI contain an instruction applicable in a civil case, and the court determines that the jury should be instructed on the subject, the OUJI "shall be

used unless the court determines that it does not accurately state the law." 12 O.S.2011 § 577.2. The "Notes on Use" for OUJI No. 23.15 state, in part: "In the last sentence, the trial judge will need to tell the jury how to calculate damages for the particular type of contract that is involved in the case." The district court's Instruction No. 22 omitted the final sentence from OUJI No. 23.15 and was incomplete because it did not provide the necessary method for calculating damages in this case. *See Smicklas v. Spitz,* 1992 OK 145, ¶ 14, 846 P.2d 362, 368 (instruction as a whole contained some proper statements of the applicable law, but the Court reversed the judgment based on its findings that the instruction was incomplete and it was probable that the appellants' case was prejudiced by the incomplete instruction).

¶ 26 The parties have different views regarding the proper measure of damages. The Hoppers argue that the correct measure is loss of profits, fair market value of undelivered assets, and cost of repairing defective assets. The Smoots assert that the components of the purchase price are stated in the Purchase Agreement. They contend that the evidence demonstrates a breach affecting each component and conclude that the purchase price was the appropriate measure of damages. However, the general measure of damages for breach of contract is established by statute.

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

23 O.S.2011 § 21. The jury instructions here do not meet this standard. For example, both the Purchase Agreement and the Restrictive Covenant contain the identical non-compete agreement. The instructions permitted the jury to award the Smoots the $68,000 attributed to breach of the non-compete agreement contained in the Purchase Agreement, and an additional $100,000 for breach of the same non-compete agreement contained in the Restrictive Covenant. Okla-homa law allows only one recovery for a single injury. *Tate v. Browning–Ferris, Inc.,* 1992 OK 72, n. 12, 833 P.2d 1218.

¶ 27 Because the jury awarded the Smoots the entire $260,000 purchase price for breach of the Purchase Agreement and the full $100,000 for breach of the Restrictive Covenant, it cannot be determined whether the Smoots received more than the "detriment proximately caused" by the Hoppers' breach of the two agreements. On remand, the district court shall draft a sentence to be added to Instruction No. 22 that instructs the jury on the proper method of calculating the damages to which the Smoots are entitled for breach of the Purchase Agreement and the Restrictive Covenant.

### B. Liquidated Damages

¶ 28 The Defendants also argue that the liquidated damage clause in the Restrictive Covenant is unenforceable. Although Defendants first raised their objection after the time set by the district court, it is the duty of the court to provide jury instructions that "accurately state the law." *Sellars v. McCullough,* 1989 OK 155, ¶ 9, 784 P.2d 1060, 1062–63.

¶ 29 The general principles applicable to liquidated damage clauses are set out in *Lasalle Bank Nat'l Ass'n v. Shepherd Mall Partners, LLC.,* 2006 OK CIV APP 91, ¶¶ 14–15, 140 P.3d 559, 562. Courts analyze three criteria when determining the enforceability of a liquidated damage clause. *Sun Ridge Investors, Ltd. v. Parker,* 1998 OK 22, ¶ 8, 956 P.2d 876, 878. When a liquidated damage clause is enforceable, the amount of damage specified "shall be presumed to be the amount of damage sustained by a breach of such contract." 15 O.S.2011 § 215(A). If the provision is enforceable, there is no issue for the jury to determine. *See Vines v. Orchard Hills, Inc.,* 181 Conn. 501, 435 A.2d 1022, 1028 (1980) (liquidated damage provisions are "private agreements to supplant judicially determined remedies for breach of contract"); *Frank v. Jansen,* 303 Minn. 86, 226 N.W.2d 739, 744 (1975) (there cannot be an award of both liquidated and compensatory damages); *Sanitary Servs. Corp. v. Greenfield Village Ass'n, Inc.,* 36 Conn.App.

395, 651 A.2d 269, 271 (1994). By submitting the issue of damages for breach of the Restrictive Covenant to the jury it appears that the district court determined the liquidated damage provision was not enforceable. However, that ruling is not reflected in the record. On remand, the district court shall determine whether the liquidated damage clause is enforceable. If the clause is not enforceable, the jury shall be instructed regarding the proper method for. calculating damages for breach of the Restrictive Covenant pursuant to the principles previously discussed.

## CONCLUSION

¶ 30 There is competent evidence in the record to support the jury verdict in favor of the Smoots and C & L, and against B & J for breach of the Purchase Agreement and the Restrictive Covenant. Likewise, there is competent evidence to support the verdict in favor of the Smoots and C & L, and against the Hoppers for breach of the non-compete provisions of the Purchase Agreement and the Restrictive Covenant. Therefore, the district court correctly denied the Hoppers' motion for judgment notwithstanding the verdict in those respects and those portions of the judgment are affirmed. However, except with respect to the non-compete provisions of the Purchase Agreement and the Restrictive Covenant, the Smoots failed to establish the Hoppers were personally liable. The Hoppers' motion for judgment notwithstanding the verdict should have been granted in that respect.

¶ 31 Further, the district court erred in failing to instruct the jury as to the proper method for calculating damages for breach of both contracts. There is a probability that the jurors were misled by this omission, and thereby reached a different conclusion than they would have otherwise reached had they been properly instructed. On remand, the jury shall be instructed as to the proper method for calculating damages for breach of the Purchase Agreement and, as a result of this Opinion, the district court shall be required to address the apportionment of damages between B & J and the Hoppers based on their respective breaches of that agreement. The district court also erred in failing to include in the record a legal determination as to whether the liquidated damage clause in the Restrictive Covenant is enforceable. If the court determines on remand that the clause is not enforceable, then the jury shall be instructed as to the proper method for calculating damages for breach of that contract. The portion of the judgment fixing the amount of damages is reversed and this case is remanded for a new trial on the issue of damages. The attorney fee judgment in favor of the Smoots is affirmed but the amount of attorney fees awarded to the Smoots is vacated. The proper amount of fees to be awarded to the Smoots from the various defendants shall be determined at the conclusion of the proceedings in the district court on the issue of damages and consistent with this Opinion.

¶ 32 **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**

BARNES, J. (sitting by designation), concurs, RAPP, J., dissents in part, concurs in part and concurs in result in part.

RAPP, J., Dissenting in part, concurring in part and concurring in result in part.

## BACKGROUND

### A. Introduction.

¶ 1 B & J Restoration Services, Inc. (B & J) was in the cleaning and restoration business. B & J was owned by Brandon Hopper (B. Hopper) and Julie Hopper (J. Hopper). Larry Smoot (L. Smoot) and Connie Smoot (C. Smoot) wished to purchase the business. The Smoots formed a limited liability company, C & L Restoration Services, LLC (C & L). With the assistance of Sunbelt Business Brokers (Sunbelt), the Smoots submitted several offers and negotiated the purchase. The negotiations resulted in *two contracts,* both prepared by Sunbelt.

¶ 2 The first contract is the Purchase Contract (PC Agreement), dated October 4,

2006.[1] This document recites that it is an agreement between B & J, as the Seller, and the Smoots, as the Buyer. The text of the document provides that it is an agreement between B & J, as the Seller, and the Smoots, as the Buyer. The text of the PC Agreement refers to "Seller" or "Buyer" when naming a party to the PC Agreement.

¶ 3 The second contract is an Agreement Not To Compete And Training Agreement (ANC Agreement), dated November 27, 2006.[2] The parties to this contract are C & L (termed "Buyer"), the limited liability company, and B & J (termed "Seller"). The document is signed by Connie L. Smoot, as managing member for C & L, and Brandon Hopper, as president of B & J. There are no other signatures on the document. Julie Hopper is not mentioned by name in the text of the document.

¶ 4 The Smoots claim that the Hoppers and B & J breached both contracts, as to their substance and as to the covenant not to compete, and sought to also impose personal liability on the Hoppers. The Smoots prevailed at trial, including imposition of personal liability on the Hoppers.

¶ 5 The issues in this appeal are: (1) whether B & J breached the contracts; (2) Hoppers' personal liability for breach of the Purchase Contract provisions exclusive of the non-competition provisions; (3) Hoppers' personal liability under the Agreement Not to Compete Contract and the non-competition provisions of the Purchase Contract; (4) whether the trial court correctly instructed the jury as to measure of damages; and (5) award of attorney fees.

¶ 6 I concur with the Majority's resolution of issue number 1. I concur in result with the Majority's resolution of issue number 2. I dissent from the resolution of issue number 3. I concur in result regarding the Majority's disposition of issue number 4, jury instructions. I concur with the Majority's resolution of the attorney fee issue, with the exception that I would hold that any award against the Hoppers, individually, should be vacated with prejudice.

### B. Fact Summary.

¶ 7 The first contract is the PC Agreement, dated October 4, 2006.[3] This document recites that it is an agreement between B & J, a corporation, as the Seller, and the Smoots, as the Buyer. The text of the Agreement refers to "Seller" or "Buyer" when naming a party to the PC Agreement. However, the signatures on this contract are by the Hoppers, without corporate designation, and it does not contain a signature block for the corporation, B & J. An attorney in the employ of Sunbelt prepared all the transaction documents and handled the closing. She testified that she mistakenly omitted the corporate designation in the signature block and a designation of Brandon Hopper as president and Julie Hopper as secretary.[4]

¶ 8 The second contract is the ANC Agreement, dated November 27, 2006.[5] The parties to this contract are C & L, a limited liability company, (termed "Buyer") and B & J (termed "Seller"). The ANC Agreement provides for liquidated damages in the sum of $100,000.00. The document is signed by Connie L. Smoot, as managing member for C & L, and Brandon Hopper as president of B & J. There are no other signatures on the document.

### C. Resolution of the Issues.

#### 1. Breach of Contract by B & J.

¶ 9 Under the applicable standard of review, and after review of the record, I agree that the evidence was sufficient to establish that B & J, the corporation, breached both the PC Agreement and ANC Agreement. Therefore, I concur with the Majority on this issue.

#### 2. Hoppers' Personal Liability/PC Agreement.

##### a. Liability For Contract Provisions Other Than Non-Competition.

¶ 10 The Majority holds that the Hoppers are not liable for the PC Agreement provi-

1. Defendants' Ex. 21.

2. Defendants' Ex. 22.

3. Defendants' Ex. 21.

4. Tr. Vol. 1, pp. 511–12.

5. Defendants' Ex. 22.

sions other than the non-competition provisions. I concur in result with this holding.

### b. Hoppers' Liability For Non–Competition Provisions of PC Agreement.

¶ 11 The Majority holds that the Hoppers are personally liable under the non-competition provisions in the PC Agreement. I dissent from this holding.

¶ 12 The Majority reached its holding notwithstanding the Majority's ruling that the Hoppers signed the PC Agreement in their corporate representative capacities and not individually. Thus, the Majority necessarily ruled that the Hoppers are not parties to the PC Agreement. I agree that they are not parties to the PC Agreement.

¶ 13 However, in order to reach the result of personal liability, the Majority examined language in the PC Agreement where "Seller," B & J, agreed not to compete as "individual, officer, employee, or any other capacity." The PC Agreement continues with language stating that the obligations extend to the officers, directors and shareholders of the Seller, and that the Seller has the authority to bind the officers, directors, and shareholders.[6]

¶ 14 There is no evidence from which it may be concluded that B & J had the authority to bind the Hoppers. The mere fact that B & J, the principal, says that it has authority to bind its agents does not equate into legal responsibility on the part of the agents.

¶ 15 The record does not contain an agency agreement or power of attorney authorizing B & J to contract for the Hoppers. *See* 15 O.S.2011, § 136 (agreements to answer for debt, default or miscarriage of another must be in writing). Next, the sole evidence is that the PC Agreement was meant to be executed by the corporation and the Majority so holds. The PC Agreement, by itself, does not inescapably lead to the conclusion that the parties intended for the Hoppers to be bound by its terms, in whole or in part.

¶ 16 This is not an instance where an agent with apparent authority binds its principal. Here, the Hoppers, in their corporate representative capacities executed the PC Agreement. "When an agent contracts in the name of his principal, the principal contracts, and is bound, but the agent is not." *Mertz v. Owen,* 1942 OK 165, ¶ 29, 191 Okla. 77, 126 P.2d 720, 727.

¶ 17 The rule from the case of *Carter v. Schuster,* 2009 OK 94, 227 P.3d 149, applies here. Schuster signed an agreement on behalf of a limited liability company and a corporation as each entity's agent. The agreement contained an arbitration clause. The issue was whether Schuster could be treated by the arbitration authority as an individual party to the arbitration. There were no legal or equitable reasons to hold Schuster personally responsible under the contract. "Because Mr. Schuster was not found to have defrauded or committed a wrongful act against Dr. Carter, but only to have breached an alleged oral agreement between the two, neither Oklahoma statutory law nor case law supports requiring him to arbitrate pursuant to a contract that he signed only as manager and agent for Apex." *Carter,* 2009 OK 94 at ¶ 26, 227 P.3d at 156. Therefore, the Oklahoma Supreme Court held that Schuster could not be compelled to arbitrate.

¶ 18 There is no legal distinction here between *Carter* and the Hoppers' situation. As the Majority agrees, no basis exists to hold the Hoppers personally responsible other than having signed the PC Agreement in their representative capacities. Therefore, I dissent to the decision to hold Hoppers personally liable under the non-competition provisions of the PC Agreement.

### c. Hoppers' Liability For Breach of ANC Agreement.

¶ 19 The ANC Agreement does not suffer from ambiguity because of signatures. When Larry Smoot identified the document in his testimony, he did not identify it as an agreement in any way binding on the Smoots

---

**6.** It is undisputed that the Hoppers are the sole officers, directors and shareholders of B & J and that B & J is the "Seller."

individually. Moreover, nothing in its text suggests they signed as individuals and assumed liability. *Julie Hopper's name does not appear on the document. Brandon Hopper executed the ANC Agreement in his capacity as president of B & J and not in his individual capacity.*

¶ 20 The Majority reasons that the Hoppers are individually liable because: (1) the ANC Agreement language is identical to the corresponding PC Agreement language; (2) Brandon Hopper's execution as president of B & J is binding on him individually absent his contention otherwise; (3) Brandon Hopper did not falsely represent that he had authority to bind Julie Hopper; and (4) the same reasons for finding personal liability as to the PC Agreement apply to the ANC Agreement.

¶ 21 First, the rule from the case of *Carter v. Schuster*, 2009 OK 94, 227 P.3d 149, also applies here.

¶ 22 Next, the parties to the ANC Agreement are not the same as the parties to the PC Agreement. The ANC Agreement is a contract between two entities, C & L Restoration Services, L.L.C. and B & J Restoration Services, Inc. The only evidence is that the ANC Agreement was meant to be executed by B & J, the corporation. There is no evidence that the Hoppers intended to be individually bound.

¶ 23 There is no document purporting to empower B & J to bind the Hoppers individually. There is no document authorizing Brandon Hopper to bind Julie Hopper.[7] Thus, the record does not contain an agency agreement or power of attorney authorizing B & J to contract for the Hoppers or for Brandon Hopper to contract for Julie Hopper. *See* 15 O.S.2011, § 136 (agreements to answer for debt, default or miscarriage of another must be in writing).

¶ 24 There is no evidence that Brandon Hopper intended to bind himself individually when he signed the ANC Agreement as the president of B & J. There is no evidence of fraud or in support of an equitable reason to disregard the entity status of B & J.

¶ 25 Therefore, I dissent from the imposition of personal liability on the Hoppers as to any aspect of either Agreement, singly or in combination. I would hold that the trial court erred in submitting the issue of Hoppers' personal liability to the jury, then entering a judgment on the verdict and not granting the Hoppers' motion for judgment NOV as to personal liability under the Agreement Not To Compete And Training Contract.

### D. Jury Instructions.

¶ 26 I concur in the result reached by the Majority regarding jury instructions and add the following.

### 1. The Purchase Contract.

¶ 27 The issue here is whether the trial court erred by omitting the last sentence from the OUJI 23.51. Thus, the trial court did not instruct the jury about how to calculate damages for the particular type of contract, the PC Agreement, and claims under the contract. In the absence of those criteria as to damages, the jury returned the purchase price to the Smoots. Hoppers argue that the verdict amounted to a rescission remedy.

¶ 28 The issue for this Court is whether the trial court erred in failing to include instruction to the jury as to proper means to determine the damages. The measure of damages for breach of contract is the amount that would place the aggrieved party in the position he would have occupied had the breach not occurred. Title 23 O.S.2011, § 21, provides that the contract measure of damages is the amount that will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things would be likely to result therefrom.

¶ 29 The benefit of the bargain rule, as applied in fraud cases, provides the plaintiff

---

7. The Majority maintains that the absence of Julie Hopper from the ANC Agreement is immaterial because she is liable under the PC Agreement and similar language therein. Such concession necessarily concedes that Julie Hopper is not a party to the ANC Agreement and is not bound thereby pursuant to any agency theory.

with the difference between the value the plaintiff gave and the amount the defendant represented the plaintiff would receive. *Bowman v. Presley*, 2009 OK 48, ¶ 14, 212 P.3d 1210, 1218; *LeFlore v. Reflections of Tulsa, Inc.*, 1985 OK 72, ¶ 33, 708 P.2d 1068, 1076.

¶ 30 The benefit of the bargain, or expectation interest, principle has been applied universally as a measure of damages for breach of contract.[8] *Ford v. Trendwest Resorts, Inc.*, 146 Wash.2d 146, 43 P.3d 1223, 1227 (2002) (contract damages are ordinarily based on the injured party's expectation interest and are intended to give that party the benefit of the bargain by awarding him or her a sum of money that will, to the extent possible, put the injured party in as good a position as that party would have been in had the contract been performed); *Thorp Sales Corp. v. Gyuro Grading Co., Inc.*, 111 Wis.2d 431, 331 N.W.2d 342, 346–47 (1983) (party injured by breach of contract is entitled to the benefit of his agreement); *Vanderpool v. Higgs*, 10 Kan.App.2d 1, 690 P.2d 391 (1984); *Qaddura v. Indo–European Foods, Inc.*, 141 S.W.3d 882 (Tex.App.2004).

¶ 31 Thus, the first paragraph of the Restatement reiterates the Oklahoma rule regarding contract damages by providing that the "expectation interest" is an individual's "interest in having the benefit of his bargain by being put in as good a position as he would have been in *had the contract been performed.*" Restatement (Second) of Contracts § 344 (1981) (emphasis added).

¶ 32 Here, the subject of the PC Agreement was the purchase of a business, including its assets, franchise, goodwill, and the covenant not to compete. The ANC Agreement separately provides for a covenant not to compete, but with different parties. The evidence demonstrated that the PC Agreement was breached in several respects with the result that the Smoots did not receive what they had bargained for, although they did receive some things of value. The Smoots' argument is essentially that there was a complete breach of the PC Agreement. However, the trial court removed the rescission remedy from consideration.

¶ 33 The PC Agreement provides the terms of the bargain for the sale of a "business" by B & J to the Smoots. The benefit of the bargain to the Smoots is to own the "business" and this "business" was supposed to have a value, determined here by the PC Agreement after negotiation. The Smoots' cause is that they did not receive the benefit of their bargain because B & J totally breached the PC Agreement.

¶ 34 Therefore, I would add that the measure of damages for breach of the PC Agreement provision for sale of the business is the difference between the value of the business had it been transferred as agreed and the value of the business as actually delivered, plus the loss of net profits, if any, to the date the Smoots ceased operations. The jury should have been instructed accordingly by completing Instruction 22. The measure of damages for breach of the ANC Agreement is compensation for the detriment caused by the breach.

¶ 35 Thus, I would reverse the cause and remand the cause for a new trial on the issue of damages only as against B & J Restoration Services, Inc.

### 2. The Agreement Not To Compete Contract.

¶ 36 I concur with the Majority's Opinion regarding liquidated damages.

### SUMMARY AND CONCLUSION

¶ 37 Pursuant to the standard of review, the Smoots and C & L established breaches

---

8. The Restatement sets out the principles:

Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee:

(a) his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed,

(b) his "reliance interest," which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or

(c) his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.

Restatement (Second) of Contracts, § 344 (1981).

by B & J of the Purchase Contract and the Agreement Not To Compete Contract. However, the Hoppers are not parties to either contract and the trial court erred in submitting their liability on these contracts to the jury and, therefore, should have granted their motion for judgment NOV. I would reverse entirely the judgment against Brandon Hopper and Julie Hopper, individually, rather than hold them liable only for breach of the non-competition provisions as the Majority does. The judgment against them for costs and attorney fees should be vacated with prejudice.

¶ 38 The trial court erred in failing to include a jury instruction explaining the proper means to determine the damages for breach of the Purchase Contract. I would reverse and remand this cause for a new trial on the issue of damages only as against B & J Restoration Services, Inc. for breach of the Purchase Contract. The Majority correctly vacated the judgment for attorney fees and costs for breach of the Purchase Contract, without prejudice as to B & J.

¶ 39 The trial court erred for failing to determine, as a matter of law, whether the liquidated damages clause in the Agreement Not To Compete is enforceable against B & J.[9] If it is not enforceable, then the jury must be instructed as to the measure of damages for breach of that contract by B & J. The Majority correctly reversed the trial court's judgment denying the motion for judgment NOV as to the liquidated damages provision.

¶ 40 The Majority's ruling necessarily requires that the judgment for attorney fees and costs for breach of the PC Agreement and ANC Agreement be vacated without prejudice. Thus, I concur in that disposition, except as to the Hoppers individually, and in their case I would reverse the judgment and vacate with prejudice.

9. Although I dissent from holding the Hoppers personally liable, I am of the view that the issue of whether the liquidated damages provision is enforceable must be decided as to each defendant independently.